Board of Trust Company Incorporation
No. 78-124

## APPEAL OF THE INCORPORATORS OF THE MANCHESTER SAVINGS BANK
## BANK
## (THE BOARD OF TRUST COMPANY INCORPORATION)

February 28, 1980

*McLane, Graf, Greene, Raulerson & Middleton*, of Manchester (*Peter G. Guenther* orally), for the plaintiff, Incorporators of the Manchester Savings Bank.

*Sheehan, Phinney, Bass & Green*, of Manchester (*William S. Green* orally), for the intervenor, Merchants Savings Bank of Manchester.

*Upton, Sanders & Smith*, of Concord (*Frederic K. Upton* orally), for the intervenor, New Hampshire Association of Savings Banks.

*Sullivan, Gregg & Horton*, of Nashua (*Sherman D. Horton* orally), for the intervenor, Indian Head National Bank of Nashua.

BROCK, J.   This is an appeal brought pursuant to RSA 541:6 from an order of the Board of Trust Company Incorporation denying plaintiff's petition under RSA ch. 386-A for authority to establish a guaranty savings bank in Manchester, to be known as the Manchester Savings Bank.

On April 4, 1977, plaintiff filed its application with the board. On July 29, 1977, the Chief Bank Examiner for the New Hampshire Banking Department filed his New Bank Investigation Report, which substantially favored approval of plaintiff's application. Following publication of the petition, a number of banks and banking organizations filed protests with the board. A public hearing was held on September 21, 1977, at which time the proponents and opponents of the application had an opportunity to present evidence concerning it.

On April 4, 1978, the board denied the application, stating that it was unable to conclude favorably on two of the five statutory determinations which the board must make under RSA 386-A:6 (Supp. 1979) before approving the application and that it was unable to find under RSA 386-A:14 "that the public convenience and advantage will be served by the establishment of such corporation. . . ."

Since the ownership structure and proposed operation of the new bank were the principal, if not sole, reasons for both the opposition to, and the board's denial of, the application, a brief description of these is essential. The new savings bank would be principally owned and controlled by a bank holding company, First Financial Group of New Hampshire, Inc. First Financial presently owns and controls The

Manchester Bank, a commercial bank which has a savings department. It is proposed that the new guaranty savings bank would do business in the same building as the commercial bank, sharing lobby space and, where possible, overhead and equipment expenses. Of more than passing importance, however, under existing federal regulations, 12 C.F.R. § 329, the Federal Reserve Board's Regulation Q, customer deposits in the guaranty savings bank would earn one-quarter of one percent more interest than similar deposits made in The Manchester Bank and other commercial banks. Therefore, First Financial, the holding company, through its affiliate commercial and guaranty savings banks would be able to offer to the public at one location the combined services and benefits of a commercial and a savings bank.

In considering the merits of plaintiff's application, the board is required to apply the criteria specified in RSA 386-A:6 (Supp. 1979), which provides that the board shall not approve an application unless it determines that:

> I. The bank will serve a useful purpose in the community in which it is proposed to be established;

> II. There is a reasonable expectation of its financial success;

> III. Its operation will not cause undue injury to existing institutions that accept funds from savers on deposit or share accounts;

> IV. The applicants are persons of good character and responsibility; and

> V. There is reasonable prospect of raising such amount of initial capital funds as the board may determine to be reasonably necessary, but not less than the requirements provided in [RSA 386-A:21].

In its opinion the board stated that it was unable to make favorable findings as to paragraphs I and III. Its finding that the proposed bank would not serve a useful purpose in the community (RSA 386-A:6 I) (Supp. 1979) rested not on a determination "that a new savings bank in Manchester could not serve a useful purpose" but rather "on the fact that the Application calls for a savings bank to be controlled by a bank holding company which would also control a commercial bank including a savings department." With respect to the criterion of paragraph III, the board did not find that the proposed bank would cause undue injury to institutions existing in its service area, but rather concluded:

. . . we are unable to determine that the operation of the proposed bank in the light of the proposed holding company arrangement would ". . . not cause undue injury to existing institutions that accept funds from savers on deposit or share accounts." [because we cannot] predict with any assurance the consequences to the structure of banking in New Hampshire of granting an application such as this one. [and] we doubt that anything but market experience following the granting of such an application as this could inform us with any assurance what the effects of our affirmative action would be on the structure of savings or commercial banking in New Hampshire.

In addition, the board ruled as a matter of law that RSA 386-A:14, relating to approval of certificates by the board after the first meeting of a new bank's incorporators, not only applied at the initial stage of the board's decision process, but actually embodied an additional and nonspecific "broad criterion" which the applicant must meet. Section 14 provides:

*Approval of.* Such certificate shall be submitted to the board of trust company incorporation, who shall examine the certificate, and who may require such amendment thereof or such additional information as they may consider necessary. *If they find that the public convenience and advantage will be served by the establishment of such corporation,* that the proposed management of such corporation will be of satisfactory character, knowledge and experience in the field of banking, and that the proceedings in other respects conform to the provisions of this chapter, they shall so certify and endorse their approval upon the certificate. (Emphasis added.)

Relying on its ruling that it must, in addition to concluding favorably on the specific criteria enumerated in RSA 386-A:6, apply the "broad criterion" of section 14 and make a separate and distinct finding that "the public convenience and advantage will be served by the establishment of" a proposed bank *before* making its decision to approve the application under RSA 386-A:7, the board concluded:

We are not able to find that the public convenience and advantage would be served, considering again the holding company context in which the proposed guaranty savings bank would function.

Our inability to conclude . . . that public convenience and advantage would be served follows from an inability to predict with any assurance the consequences to the structure of banking in New Hampshire of granting an application such as this one.

In summary, the board's reasons for denying the application all related to the proposed bank's affiliation with The Manchester Bank and its parent holding company, First Financial Group, and not to considerations relating to the proposed bank standing by itself.

■ The standard of review generally applied by this court to decisions of the board is set out in RSA 541:13. Except for errors of law, this court will not set aside or vacate a decision of the board unless the party seeking to set it aside demonstrates by a clear preponderance of the evidence that the order is unjust or unreasonable. *LUCC v. Public Service Co.*, 119 N.H. 332, 340, 402 A.2d 626, 631 (1979); *The Bedford Bank v. State*, 116 N.H. 649, 651, 365 A.2d 734, 736 (1976). However, when the issues on an appeal implicate provisions of our Constitution, this court will undertake a more intensive review. *N.E. Household Moving & Storage, Inc. v. Public Util. Comm'n*, 117 N.H. 1038, 1041, 381 A.2d 745, 748 (1977).

Because both the transcript of proceedings below and the board's opinion are fraught with concern over a perceived competitive disadvantage which other banking institutions might encounter if the pairing of commercial and savings banks through the holding company structure were allowed, review of this case will be tempered by our consideration of the constitutional provision that raises free and fair competition to the status of constitutional rights in this State. N.H. CONST. pt. II, art. 83; *N.E. Household Moving & Storage, Inc. v. Public Util. Comm'n supra.*

■ The plaintiff contends that the board's determinations that the proposed bank would not serve a useful purpose, might cause undue injury to existing institutions, and would not serve the public convenience and advantage were not supported by the evidence and are unreasonable and unlawful. For the reasons that follow, we agree.

I. *Useful purpose*

■ We examine first the board's finding that the proposed bank would not "serve a useful purpose in the community in which it is proposed to be established." RSA 386-A:6 I (Supp. 1979). The sole reason given by the board for this finding was that the proposed guaranty savings bank would be controlled by a bank holding

company which also controls a commercial bank with a savings department, an arrangement that "precludes competition except at the expense of the depositors of one affiliate or at the expense of the stockholders of another affiliate and its parent."

The board's finding on the "useful purpose" criterion was made without specific reference to the useful purposes that the proposed bank might serve absent affiliation. We have therefore reviewed the substantial quantity of evidence that was presented to the board that would support a finding that the proposed bank, if unaffiliated, would serve a "useful purpose" in its trade area. In general, this evidence shows that the new bank intends to offer its depositors the maximum allowable interest rate on their deposits and to make substantial sums of money available to the public for residential mortgages. We note also that, apart from considerations relating to the new bank's affiliation, the chief bank examiner, in his report, concluded:

> The population growth of the area along with continued economic expansion and viability appears to satisfy the "useful purpose" factor with respect to a new thrift entry.
>
> While the area appears to be adequately banked with main offices and strategically located branches, an additional new thrift entry could offer and supply a public benefit and thereby be useful to the community.

We conclude, on the evidence presented, that the only reasonable finding that could be made is that the proposed bank, *if unaffiliated,* would serve a useful purpose.

This leads to our consideration of the question whether the board's finding that the affiliation of the proposed bank prevents it from serving a useful purpose in the community is either unlawful or unreasonable.

Keeping in mind that the reason given by the board for its finding that the affiliation of the proposed bank prevented it from satisfying the useful purpose criterion was that the arrangement would prevent competition between the savings and commercial bank, except at the expense of one or the other and its parent, we must decide whether the conditions and circumstances of competition between the proposed bank and the commercial bank are relevant at all to a determination of the useful purpose criterion of the statute.

The precision of the logic employed by the board in reaching its decision aside, we fail to understand how factors relating to competition between the proposed guaranty savings bank and the commercial bank could have any relevance to the useful purpose criterion. While the board's concern for the holding company and its

shareholders is commendable, the board's duty is to assess generally the benefits to the public in deciding whether the useful purpose criterion is met. It is not the board's task to consider the adverse effect, if any, which might result for a very limited group of shareholders who are apparently eager to enter into the proposed enterprise. Accordingly, a finding that the proposed bank would not serve a useful purpose in the community based on this factor cannot be reasonably supported and therefore is unlawful under RSA 541:13. We hold that on the evidence presented to the board it was unreasonable for the board not to find that the proposed bank would serve a useful purpose within the meaning of RSA 386-A:6 I.

## II. *Undue injury to existing institutions*

The second criterion that the board determined the plaintiff had failed to satisfy was that operation of the proposed bank "[would] not cause undue injury to existing institutions that accept funds from savers . . . ." RSA 386-A:6 III (Supp. 1979).

In making this determination, the board ruled that the plaintiff had the burden of proving to the board's satisfaction that approval of the application would not cause undue injury to existing banking institutions generally, or to the structure of banking as it exists in New Hampshire, a burden which the plaintiff failed to meet. The plaintiff, on the other hand, contends that the burden imposed on it by section 6 III is limited to proving to the board's satisfaction that undue injury will not result to banking institutions already operating in the proposed bank's trade area.

It is apparent, however, that the board did not consider it of great significance whether "undue injury" under section 6 III refers to injury to banking institutions in the trade area of the proposed bank or to banks elsewhere in the State. The board said that even if it accepted the plaintiff's argument that the undue injury criterion related only to banks in the proposed bank's trade area, "we would conclude on this point [undue injury criterion] as we have . . . ."

The board stated that its "inability to conclude that operation of the proposed bank would not cause undue injury within the meaning of section 6 III (Supp.) . . . follows from an inability to predict with any assurance the consequences to *the structure of banking in New Hampshire* of granting an application such as this one." (Emphasis added.) This conclusion was reached notwithstanding the fact that none of the many Manchester trade area bankers who were interviewed confidentially by the chief bank examiner during the course of his investigation or who testified at the hearing expressed any concern that operation of a new savings bank would cause them

undue injury. The board attached little or no significance to their statements and, instead, relied upon the testimony of an expert witness produced by counsel for The Association of Savings Banks to the effect that should the application be granted it "would profoundly alter the banking structure as it exists in New Hampshire causing undue injury to the mutual savings banks." The exact nature of the perceived adverse effects on the structure of banking in New Hampshire is difficult to ascertain from the record, particularly in light of the board's observation that:

> ... we doubt that anything but market experience following the granting of such an application as this could inform us with any assurance what the effects of our affirmative action would be on the structure of savings or commercial banking in New Hampshire.

There are at least two important ramifications implicit in the board's observation. First, the board's application and consideration of the undue injury criterion of section 6 III is statewide, rather than limited to a smaller geographic area. Second, the board equates its qualms about the effect which the proposed bank might have on the banking structure as it presently exists in New Hampshire with "undue injury to existing institutions that accept funds from savers...." We will now proceed with an examination of both of these ramifications.

Because we believe it crucial to the board's consideration and determination of the undue injury criterion under section 6 III, we address the issue of whether "undue injury" relates to injury to banking institutions operating generally in New Hampshire or only to those presently operating in a proposed bank's trade area.

█ In holding that undue injury refers only to injury to banking institutions already operating in a proposed bank's trade area, we are persuaded not only by the fact that the legislature used the phrase "community in which it is proposed to be established" in another subsection of the same statute (RSA 386-A:6 I) but also by the fact that banking laws are adopted for the benefit and protection of the public and are not intended to prevent or deter competition among banks. A. MICHIE, 1 BANKS & BANKING § 4 at 19 (1973).

An interpretation of section 6 III which would place the burden on applicants for a new bank charter to satisfy the board that operation of its proposed bank would not cause undue injury to banks remote from the trade area in which it intends to operate would be inconsistent with legislative intent.

We next consider whether the potential impact that the operation of the proposed bank might have on the structure of banking in New Hampshire may be considered by the board as constituting "undue injury to existing institutions" within the meaning of section 6 III. We note at the outset that the board admitted that it was unable to specify what adverse consequences would be visited upon the statewide banking structure if it were to approve the application. We believe, however, that the overriding purpose of section 6 III is to insure that a newly established bank will not jeopardize the ultimate security of funds deposited by customers in other banks within the proposed bank's trade area. There was no evidence presented to the board that suggested such funds would be jeopardized as the result of the operation of the proposed bank. Rather, the testimony of those witnesses who expressed concern that operation of the proposed bank would cause undue injury to existing institutions related only to the effects which approval and operation of the proposed bank would have on competition within the existing statewide banking structure.

The board expressed concern that it could not determine what numbers of banks might establish a similar corporate structure and ultimately, as a group, drive smaller State banks out of the market. In short, the board feared that mutual savings banks and smaller banks in the State could not compete with a proliferation of banks with an ownership structure similar to that of the proposed bank. It appears that it was not so much the board's concern that the proposed bank would cause undue harm to existing institutions, as it was its fear that an excess number of such banks in the future would drastically affect the established corporate structure of banking in the State, which resulted in the board's negative finding as to the undue injury criterion of section 6 III.

■ ■ The board, however, overlooks the fact that any State-chartered banks that desire to establish a similar corporate structure and operate in the same manner as the plaintiff must first obtain the board's approval. Because the board has the power to prevent the proliferation of similarly structured banking institutions should experience with them and circumstances surrounding such applications justify its doing so, it is unreasonable for the board to deny *this* application on the basis that an excess of such banks might possibly cause undue harm to existing banking institutions. Under the terms of RSA 386-A:6 III (Supp. 1979), the inquiry is whether the operation of the proposed bank will cause undue injury to other banking institutions and not whether an excess of similar banks might cause such injury. The fact that the proposed bank will generate more

competition is not, by itself, a sufficient reason for the denial of the plaintiff's petition. N.H.CONST. pt. 2, art. 83; *see O'Neil v. Public Util. Comm'n*, 119 N.H. 930, 410 A.2d 244 (1979). We hold that the board's finding with respect to the undue injury criterion, based as it is upon effects that operation of the proposed bank might have on the structure of banking in New Hampshire, was not justified and is therefore unlawful under RSA 541:13.

### III. *Public Convenience and Advantage*

Finally, we consider the board's ruling that in judging the merits of the plaintiff's application it is required "to apply the criteria provided by RSA 386-A:6 (supp.) and by RSA 386-A:14." The board concluded that, despite its "somewhat eccentric placement in the statute," an additional "broad criterion" which the plaintiff must meet and the board must consider, before making its decision under section 7, is created by the following language in section 14:

> If they find that the public convenience and advantage will be served by the establishment of such corporation ... they shall so certify and endorse their approval upon the certificate.

We disagree with the board. In RSA ch. 386-A, the legislature has provided a comprehensive and orderly procedure for the incorporation of savings banks. Section 6 specifies five criteria with respect to which favorable findings must be made by the board before it can approve an application. After consideration of those criteria, section 7 provides that the board "shall *then* decide" (emphasis added) whether the application will be approved or disapproved. Should the board approve the petition, the incorporators may then take such steps as are necessary to incorporate the proposed bank, such as holding the first meeting of the incorporators (section 8), electing a temporary clerk, adopting by-laws and electing officers and a board of directors (section 12). A majority of the directors must then execute, under oath, the certificate provided for in section 13 and submit it to the board, as required by section 14.

The board must then examine the certificate. It may require that it be amended or request such additional information from the directors and officers, the specific identity of whom may not have been known to the board before the certificate was filed, as it deems necessary. Should the board find that the proposed management of the bank is of satisfactory character, knowledge, and experience in the field of banking, that the proceedings in other respects conform to the provisions of RSA ch. 386-A, and that the public convenience and

advantage will be served by the establishment of the new banking corporation, it shall so certify and endorse its approval upon the certificate.

■ Section 14 cannot fairly be interpreted as creating an additional "broad criterion" separate and distinct from those enumerated in section 6, nor can it be construed so as to apply, in whole or in part, at the time of the hearing (section 6) or when the board makes its decision on the application (section 7). We hold that the provisions of section 14 apply only after the board has rendered a favorable decision on the application under section 7 and the section 13 certificate has been submitted to the board.

Nor do we interpret the language of section 14 as requiring that the board make a de novo decision on the application. The "public convenience and advantage" finding contemplated in section 14 neither imposes additional requirements upon the applicant nor creates new criteria by which its application is to be judged. The term "public convenience and advantage" is merely an abbreviated way of referring to the section 6 criteria. The finding required by section 14 is an expression of the legislature's intent that the board should have the opportunity to reassess its favorable findings on these criteria should a material change in circumstances affecting these criteria occur between the board's section 7 decision and its final approval under section 14.

Although never expressly stated by the board, the clear implication of its lengthy written opinion is that, but for the reasons relied upon therein, it would have acted favorably on plaintiff's application. Such a favorable result was amply supported by the evidence before it. The case is remanded to the board for the development of findings on the existing record to support a new order consistent with this opinion. *N.E. Household Moving & Storage, Inc. v. Public Util. Comm'n*, 117 N.H. 1038, 1043, 381 A.2d 745, 748 (1977); *Society for the Protection of N.H. Forests v. Site Evaluation Comm.*, 115 N.H. 163, 171–75, 337 A.2d 778, 785–87 (1975).

*Order vacated; remanded.*

BOIS and KING, JJ., did not sit; the others concurred.