Board of Trust Company Incorporation
No. 86-199

## Appeal of Concerned Corporators of the Portsmouth Savings Bank

## (New Hampshire Board of Trust Company Incorporation)

March 30, 1987

184

*Shaines & McEachern P.A.*, of Portsmouth (*Paul McEachern* and *Matthew T. Brock* on the brief, and *Mr. McEachern* orally), for the petitioners.

*Upton, Sanders & Smith,* of Concord (*Frederic K. Upton* and *Robert W. Upton, II,* on the brief, and *Mr. F. Upton* orally), for Amoskeag Bank Shares, Inc.

*Brown and Nixon P.A.,* of Manchester (*David L. Nixon* and *Leslie C. Nixon* on the brief, and *Mr. Nixon* orally), for Portsmouth Savings Bank.

PER CURIAM. This appeal is brought by twelve corporators of the Portsmouth Savings Bank (Portsmouth or Bank) pursuant to RSA chapter 541. They seek an order vacating a decision of the board of trust company incorporation (board or BTCI) granting Portsmouth's application for conversion from a mutual savings bank to a guaranty (stock) form of organization and for its simultaneous acquisition by Amoskeag Bank Shares, Inc. (Amoskeag), a bank holding company. We hold that, as a matter of law, the Bank trustees' plan of conversion-acquisition is unfair to the depositors of the Bank. Accordingly, we vacate the board's order.

I. *The Application and The Board's Decision*

Because this case is complex, it will be helpful to discuss its development in some detail.

A. *The Proposed Transaction*

The Bank is at present a mutual savings bank and, as such, has no capital stock. It is not a member of the Federal Reserve System, but its deposits are insured by the Federal Deposit Insurance Corporation (FDIC). Upon conversion to a guaranty form of organization, it will issue one class of capital stock; that is, common stock with a par value of one dollar per share. In total, 100,000 shares will be issued.

All of these shares ultimately will be purchased by Amoskeag. Further, Amoskeag will offer shares of its common stock in a two-phased offering: first, a subscription offering to eligible depositors of the Bank and to its corporators, trustees, officers and employees; and second, a public offering. Eighty percent of the proceeds of the sale of Amoskeag stock will then be used to purchase all of the authorized capital stock of the Bank. The rest of the proceeds will be retained by Amoskeag for its general corporate purposes. The resulting corporate relationship will be that of a wholly-owned subsidiary and its holding company parent.

B. *The Board of Trust Company Incorporation's Decision*

In its opinion issued on March 31, 1986, the board found that the application complied with all applicable statutes and regulations, and further specifically found that the conversion plan was fair to Portsmouth's depositors, *see* N.H. ADMIN. CODE Tru 505.03 (hereafter the board's regulations will be styled Tru ___), in that it complied with the following legal requirements: "[I]t protects depositors' accounts, establishes a liquidation account, and provides priority subscription rights in the stock of the acquiring holding company." One member of the board, the State treasurer, agreed that the plan conformed to the regulations. However, in a separate concurrence, she expressed concern regarding whether the plan was substantively fair to Portsmouth's depositors.

The chairman of the board, Bank Commissioner A. Roland Roberge, dissented from the majority's position, expressing his belief that the board had erred in a number of ways in finding that the plan of conversion was fair to the depositors. The central thesis of Chairman Roberge's dissent was that the majority "limit[ed] the concept of fairness to merely the rigid application of the technical and legal requirements of the regulations." According to the chairman, "[t]hat is a mechanical interpretation of fairness that can only be applied without an analysis of the facts and knowledge of the banking industry." The dissent then pointed out four areas of unfairness the majority had overlooked. Stated briefly, Chairman Roberge believed the majority erred by: (1) "refusing to find that trustees of a mutual savings bank owe a fiduciary duty to the depositors[;]" (2) not considering the feasibility of a simple "stand-alone" conversion, without subsequent acquisition by Amoskeag; (3) allowing a conversion-acquisition which did not satisfy statutory obligations to depositors by "issuing voting trust certificates, shares of common stock, or any other value equivalent to their respective share of the Portsmouth surplus and net worth[;]" and (4) approving

a conversion of the depositors' interest in the Bank's surplus into an interest in a liquidation account, which, according to the chairman, was a diminution of the depositors' rights. The chairman also pointed out that the Bank is now empowered to pay a percentage of profits to its depositors and that the conversion-acquisition frustrates the depositors' reasonable anticipation of such payments.

Pursuant to the provisions of RSA 541:3, the dissident corporators filed a motion for rehearing which was denied by order dated April 22, 1986. See RSA 541:5. In denying the corporators' motion for rehearing, the board made the following points, inter alia: (1) Nothing in the charter requires the trustees to distribute profits; the discretion of the trustees to distribute profits has been limited by RSA 386:9, RSA 386-A:23, and Tru 502.06; and (2) the board's rules do not require it to inquire into the existence of a fiduciary duty.

On appeal, the petitioners raise two general issues. First, they argue that the board does not have jurisdiction to approve the proposed conversion-acquisition transaction. Second, they contend that the proposed plan is not fair to Portsmouth's depositors. This general contention is then broken down into several separate arguments, more or less echoing the points discussed by Chairman Roberge's dissent. In addition, they argue that implementation of the plan would result in a violation of the Bank's charter. Put most simply, the thrust of the appellants' argument is that, if the Bank is to convert, it should transact a stand-alone conversion.

In response, Amoskeag and Portsmouth collectively argue that, because the petitioners have no concrete interest in the outcome of this litigation, they lack standing to maintain the action at all. On the merits, they argue that the board acted within the scope of its jurisdiction in approving the plan, that the board could not evaluate fiduciary obligations of the trustees, and that the plan is substantively fair to depositors because it preserves, through the setting up of a liquidation account, the interests of the depositors in Portsmouth's net worth. They further contend that Portsmouth's charter would not be violated by implementation of the plan and that failure to provide Portsmouth's depositors with subscription rights in the pre-acquisition issuance of stock by Portsmouth does not render the proposed transaction unfair. The defendants argue also that, in any event, the charter has been superseded by modern statutory and regulatory law.

We will consider each of these issues in the following order: first, whether the corporators have standing to conduct this litigation; second, whether the board had jurisdiction to approve the proposed

transaction; and, finally, if the board properly exercised jurisdiction over the matter, whether the plan is fair to depositors.

## II. *Procedural Issues*

### A. *Standing to Sue*

 Portsmouth and Amoskeag maintain as a procedural matter that the corporators lack standing to conduct this litigation because they have no stake in its outcome, citing *Blanchard v. Railroad,* 86 N.H. 263, 167 A. 158 (1933). Counsel for Portsmouth purported to waive the issue at oral argument, stating that he preferred that the court not decide this case on that basis, as he believed that the petitioners would simply commence suit again with depositors as parties. However, we observe that the transcript of the October 1, 1985 hearing before the board reveals that at least two of the corporators who testified at that hearing were also depositors of the Bank. Thus, at least some of the dissident corporators have a concrete interest in the outcome of this litigation within the meaning of RSA chapter 541, and therefore have standing to appeal.

### B. *Jurisdiction*

The petitioners argue that the board had no jurisdiction to approve this proposed transaction because RSA 386:10, II limits the board's authority to the evaluation of conversions only. Thus, authority to approve a conversion-acquisition is outside the scope of the board's power. Further, it is argued, since the board can adopt rules regarding conversions only to the same extent as conversions are permitted by federal law, and since federal law requires bank members, including depositors, to approve a conversion-acquisition, then Portsmouth's depositors must approve this plan also. The petitioners accordingly argue that because Tru 506.02 purports to allow conversion-acquisitions without depositor approval, it is in conflict with federal law and therefore invalid. The final jurisdictional argument raised by the petitioners involves RSA chapter 388, which deals with bank unions and consolidations. Under that statutory scheme, the board is excluded from reviewing such unions, and jurisdiction over them is vested in the banking commissioner and the superior court. Petitioners, therefore, argue that RSA chapter 388 governs this transaction.

Portsmouth and Amoskeag argue, to the contrary, that the corporators' reading of RSA 386:10, II is both too narrow and inconsistent with the legislative intent expressed in RSA 394-A:1 to avoid disadvantaging State-chartered banks vis-à-vis their federal counterparts. They further argue that RSA chapter 388 applies only to

mergers and consolidations, not acquisitions, and is therefore irrelevant to this transaction. In addition, they argue that the board's rules need not track the Federal Home Loan Bank Board's (FHLBB) rules, but need only be comparable. In this instance, they claim, the conversion rules are substantially similar. Finally, the fact that, at the time of the proposal, the legislature had not responded to recent conversions by changing the statutory process for conversion indicates to Portsmouth and Amoskeag that their actions conform to the legislature's intent. The 1986 revision of RSA 386:10, II that requires depositor approval of a conversion with simultaneous acquisition by an existing holding company does not apply to applications filed with the BTCI before July 19, 1986; that is, the application before us was "grandfathered."

We begin by setting forth the relevant enabling statute under which the contested rules were promulgated. RSA 386:10, II provides that

> "[n]otwithstanding any other provision of law to the contrary, the board of trust company incorporation may adopt rules pursuant to RSA 541-A permitting any mutual savings bank to convert to stock form in the same manner, to the same extent and with comparable limitations as federal savings and loan associations operating within this state are permitted under rules of the Federal Home Loan Bank Board."

The relevant State administrative rules are contained in Tru chapter 500, and we describe them briefly. The regulatory scheme adopted by the board sets out four general requirements governing conversion applications: First, a conversion plan must comply with the board's rules; second, the conversion must not result in a diminution of reserves and net worth; third, the conversion must not trigger a taxable reorganization; and, finally, accounts in the converted bank must be insured by the FDIC. *See* Tru 502.01. The next two rules, Tru 502.02 and 502.03, set out required and optional provisions, respectively, of a conversion plan.

Tru 502.05 mandates the creation of a liquidation account "in an amount equal to the net worth of the converting savings bank set forth in its latest statement of financial condition contained in the final prospectus or offering circular[,]" for the benefit of eligible account holders, who are defined to include any person who holds a qualifying deposit under Tru 502.04, and supplemental eligible account holders, as defined in Tru 502.01(y). The interest of each such account holder is styled an "inchoate interest." Tru 502.05(b).

The liquidation account rule gives these account holders an interest superior to the holders of capital stock.

Tru 505.01 describes the required contents of the application for conversion. After an application is filed and public notice thereof is given, *see* Tru 505.02, the board reviews the complete application and, if the plan is found to be fair to the depositors and if deposits will remain insured after the conversion, approves the application. *See* Tru 505.03. Then, the approved plan must be submitted to a special meeting of the bank's corporators, after due notice is given to them. Approval requires "a majority vote of the total number of votes eligible to be cast by the corporators on the matter." Tru 505.04(d). When the resulting affirmative resolution is submitted to the bank commissioner, the board certifies the amended articles of agreement or charter, after which a certified copy is filed with the secretary of state, who records them and issues a certificate of amended incorporation.

Tru 506.02 sets out the requirements for the conversion and acquisition of a savings bank by an existing holding company:

> "In such a transaction the eligible account holders, supplemental eligible account holders and other persons having subscription rights, with respect to the capital stock of the converting savings bank shall receive, without payment, subscription rights under Tru 502.02(d) and (f) and Tru 502.03(c) and (d) from the holding company to purchase its equity securities in lieu of all the capital stock of the converting savings bank, and all of the equity securities of the holding company not purchased by holders of subscription rights shall be offered and sold in a public offering or a direct community offering as provided in Tru 502.02(g). The total price at which the securities of the holding company shall be sold shall be based on an independent valuation, as provided in Tru 504.06. Unless clearly inapplicable, all of the requirements of chapter 500 shall apply to a conversion under Tru 506.02."

■ The corresponding rules promulgated by the FHLBB appear at 12 C.F.R. § 563b (1986). Those rules include a provision governing conversions involving an acquisition by an existing bank holding company. *See* 12 C.F.R. § 563b.10(a) (1986). The parallel board regulation, Tru 506.02, is not exactly identical to the federal rule, but closely tracks it. In view of the express intent of the legislature to allow conversions to the extent allowed by federal law, we hold that

insofar as petitioners rely on any inherent limitation in RSA 386:10, II, their argument is without merit.

The second jurisdictional argument presented by the petitioners is based on a mistaken view of the implications of federal law. It is true that 12 C.F.R. § 563b.6(a) (1986) requires submission of a plan of conversion to the members of the converting bank, who must approve it by a majority vote. The petitioners assert that federal law defines members to include depositors and that, since Tru 505.04 does not require depositor approval, it is contrary to federal law and therefore invalid. However, the incorrectness of this view of the law becomes evident upon a reading of 12 C.F.R. § 563b.2(a)(21) (1986), which defines member as "any person qualifying as a member of an insured institution pursuant to its charter or bylaws[,]" and *see also* 12 C.F.R. § 563b.2(a)(5) (1986) (defining association members as those eligible to vote at the meeting at which the conversion will be voted upon). Portsmouth's charter contemplates that the members of the Bank are its corporators, and not its depositors. *See* Charter of Portsmouth Savings Bank § 5, Laws 1823, 27:5. Article VII of the Revised By-Laws states that:

> "[t]he powers of the Corporation are vested, by statute, in the Board of Corporators and their duties and responsibilities are more specifically set forth in these By-Laws. The management of the Corporation is vested in the Board of Trustees and the day-to-day operations are delegated to the duly elected Officers of the Bank, subject however, to the direction and control of The Full Board of Trustees, as provided in these By-Laws."

Revised By-Laws of the Portsmouth Savings Bank art. VII (February 1, 1984); *see also id.*, at art. I. Thus, since federal law refers one back to the Bank's charter and by-laws, and since in this case those documents do not appear to include depositors as members of the Bank, then the lack of a requirement of depositor approval in this instance does not render the procedure inconsistent with federal law.

RSA chapter 388 refers to "consolidation" or "union" of banks. The petitioners argue that conversion-acquisition plans should be governed by that chapter. However, Portsmouth and Amoskeag maintain that RSA 386:10, II and regulations promulgated thereunder govern this transaction. We agree with the latter assertion. Consolidations are not identical to acquisitions. In a consolidation under RSA chapter 388, one of the institutions may not survive, whereas in an acquisition both entities generally continue to

exist. In this instance, Portsmouth will remain in existence as, essentially, a wholly-owned subsidiary of Amoskeag, a bank holding company organized under RSA chapter 293-A (Supp. 1985). *See* 15 W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 7046, at 31 (1983 rev. ed.). Therefore, RSA 386:10, II governs this transaction, and the conversion-acquisition rules were validly promulgated thereunder by the board.

## III. *Fairness*

The focal dispute in this case is whether the conversion-acquisition is fair to the depositors. Portsmouth's trustees contend that the board correctly ruled that the plan is fair if it conforms to the prescriptions of Tru 506.02 and Tru 502.05. The corporators appeal on the ground that substantive fairness is an additional, independent requirement of the board's rules. The appellants argue that fairness in the present case cannot exist apart from Portsmouth's charter and the fiduciary duty of the trustees to Portsmouth's depositors.

The trustees believe the depositors' rights are limited to their deposits and an inchoate interest in the Bank's surplus, with that interest vesting only in the event of a complete solvent liquidation of the Bank. On the other hand, the petitioners base their claim on section 2 of the charter, which states in pertinent part that "the net income and profits of all deposits of money received by [Portsmouth] shall be paid out and distributed in just proportions, among the several persons by or for whom the said deposits shall have been made . . . ." Laws 1823, 27:2. We will return to this text for a much closer scrutiny, but for now it suffices to say that the petitioners interpret it to mean the depositors have a vested right to distributions from surplus at the time of the conversion. If the petitioners are correct, then the proposed conversion-acquisition unfairly reduces the depositors' rights.

Before we address these arguments, we emphasize that the reach of this case is narrowly limited by two unusual circumstances. First, the legislature has recently amended RSA 386:10, II, so that all conversion-acquisitions of the type before us that are filed on or after July 19, 1986, require ratification by the depositors of the converting bank. Secondly, other than Portsmouth Savings Bank there are only two remaining mutual savings banks in New Hampshire chartered prior to 1842, when the legislature enacted a general incorporation law reserving to the State the power to alter or repeal corporate charters. RS 146:26 (1842). *See Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 712 (1819) (Story, J., concurring).

The antiquity of a party's rights cannot diminish their strength, but the overlays of history may obscure their ancient foundations. In the present case, Portsmouth's charter of 1823, which was a special act of incorporation by the legislature, Laws 1823, ch. 27, lies beneath a complex structure of twentieth century State and federal banking regulation. For the reasons which follow, we conclude that the depositors' rights are supported by the nineteenth century foundation rather than encompassed by the twentieth century superstructure. We hold that the trustees' plan of conversion-acquisition is unfair to the depositors, as a matter of law.

The petitioners argued below that the depositors are entitled to subscription rights in Portsmouth stock as part of a stand-alone conversion. We, however, do not specify what course the Bank's trustees may, or even must, take in the event of a stand-alone conversion; rather, we merely vacate the board's approval of the conversion-acquisition, as particularly requested by the petitioners.

A. *The Depositors' Charter Rights To The Surplus*

Three analytical theorems underlay the board's decision. In its Memorandum Opinion and Order of March 31, 1986, the board posited first that its rules "protect the interests of depositors in a manner consistent with judicial decisions [and] RSA 386-B:1, III[.]" Thus, secondly, the board limited its analysis of fairness solely to a review of the application for conformity to the board's own rules. The opinion states, at page 8:

> "For the foregoing reasons, the board decides, as a matter of law, that a plan of conversion is fair to depositors if it protects depositors' accounts, establishes a liquidation account, and provides priority subscription rights in the stock of the acquiring holding company. The board finds that Portsmouth Savings Bank's plan of conversion contains such provisions. Consequently, the board determines the plan of conversion to be fair to depositors."

Finally, in denying the petitioners' motion for rehearing, the board stated that nothing in the charter *"requires* the bank's trustees to distribute profits to depositors[.]" (Emphasis in the original.)

As to the board's decision to limit its review of the application to whether the application conformed to the regulations, we start from the constitutional principle that the board may, in its wisdom, encourage conversions of mutual banks by adopting regulations such as Tru 506.02, but the regulatory scheme cannot supplant the depositors' charter rights. U.S. CONST. art. I, § 10 ("No state

shall . . . pass any . . . law impairing the obligation of contracts. . . ."); N.H. CONST. pt. I, art. 23 (prohibiting retrospective laws). The language of part I, article 23 is crystal clear: "Retrospective laws are highly injurious, oppressive, and unjust." We look next at the regulations, attempting to read them in a way that does not contradict constitutional principles. *See White v. Lee*, 124 N.H. 69, 74, 470 A.2d 849, 852 (1983). In this light, the last sentence of Tru 506.02 is striking: "Unless clearly inapplicable, all of the requirements of Chapter 500 shall apply to a conversion under Tru 506.02." Under Tru 505.03, the board must determine whether the plan is fair to the depositors. Thus, fairness is not determined by Tru 506.02, but rather supersedes it. Put another way, the fact that Portsmouth's plan corresponds to each of the listed requirements of Tru 506.02 does not by itself make the plan fair to the depositors.

The Bank's duties to its depositors are determined by its charter. Portsmouth's charter does not use the words "distribution" or "surplus." Our Brother Souter reasons from this absence of an express grant that the source of a right to distributions must be judicial interpretation. This, of course, is correct, but he overlooks that we can interpret the charter both by reference to judicial precedent and by construing the actual text of the charter. Because the board and Justice Souter have emphasized precedent so strongly, we will look there first.

The board ruled that the requirements of Tru 506.02 conform to judicial decision. This ruling derived primarily from *In re City Savings Bank*, 113 N.H. 378, 309 A.2d 31 (1973) and *York v. Federal Home Loan Bank Bd.*, 624 F.2d 495, 499–500 (4th Cir.), *cert. denied*, 449 U.S. 1043 (1980). Put simply, both of these cases hold that depositors' ownership of mutual savings banks is only theoretical. However, *York* and other federal case authority prior to *Paulsen v. Commissioner*, 469 U.S. 131, 138 (1985), must be viewed skeptically in light of *Paulsen*'s statement that depositors in a federally chartered mutual savings bank are the equitable owners of the bank's surplus, even though that equitable ownership has minimal value for tax purposes.

■ We will return to *City Savings Bank*, but first we address the board's reference to RSA 386-B:1, III (Supp. 1986). That section defines the depositors' "proprietary interests" as "proportionate inchoate interests . . . in the net worth of [the mutual savings] bank, such interests maturing and being realized upon the bank's liquidation . . . [,]" which is analogous to Tru 502.05(b). Nonetheless, RSA chapter 386-B (Supp. 1986) concerns a different process than the

process contemplated by the plan before us; namely, reorganization of mutual savings banks into mutual holding companies. In any event, what applies to the board applies as well to the legislature: RSA 386-B:1, III (Supp. 1986) cannot extinguish charter rights.

In *City Savings Bank supra*, Chief Justice Kenison framed the issue:

> "The issue presented on this appeal is whether dissenting depositors in a mutual savings bank are constitutionally entitled to a right of appraisal and cash payment option for their share of the bank's surplus."

113 N.H. at 379, 309 A.2d at 31. The transaction in *City Savings Bank* was a conversion-merger in which the mutual savings bank deposits were transferred to a newly created trust company, and each depositor received stock in the trust company proportionate to his or her share of the converting mutual's surplus. Thus, the issue was not whether the depositors owned the bank's surplus, for the court's phrasing of the issue assumed they did. Instead, the issue was whether the converting bank had to treat dissenting depositors as a stock corporation would have to treat dissenting shareholders, so that dissenting depositors would have cash appraisal rights.

We observed that:

> "the charter of City Savings provides in section 6 that '*all profits* arising from said business shall be equitably divided among the depositors at such times and in such manner as the Trustees may determine. . . .' (emphasis added). The trustees have determined in this case to divide the profits via a distribution of stock of the new bank."

113 N.H. at 382–83, 309 A.2d at 33. In rejecting the depositors' argument, we discerned a historical divergence of mutual savings depositors from commercial bank stockholders. We were of the view that a depositor's ownership of a modern mutual savings bank had diminished to a "technical fiction," 113 N.H. at 381, 309 A.2d at 32 (quoting Kreider, *Who Owns the Mutuals? Proposals for Reform of Membership Rights in Mutual Insurance and Banking Companies*, 41 U. Cin. L. Rev. 275, 276 (1972)). We held that, given the trustees' discretion and the reduced power of the modern depositor, there was no reason why the charter should not control, as it did in other instances. *See Bank Commissioners v. Banking Co.*, 74 N.H. 292, 67 A. 583 (1907).

The Portsmouth trustees urge that *City Savings Bank* controls the present case. We disagree. Whether depositors are entitled to a

statutorily-created right of cash appraisal upon statutory merger or other major change in corporate identity, *see* RSA 293-A:81 (Supp. 1986); *Perkins v. Company*, 90 N.H. 534, 540, 13 A.2d 475, 477 (1940) (on rehearing), is a far different question than whether depositors are entitled to a charter-created right to distributions of surplus from a solvent, on-going bank. Indeed, *City Savings Bank* indicates that the depositors in that case did have a right to distribution of the surplus, but held that their right was adequately protected by the ratable stock transfer. It is clear that if depositors were entitled to a cash payment, a converting bank would risk exhaustion of its surplus. *City Savings Bank* noted a bank commissioner's report to that effect. What is striking about that report is that it treats the depositor as an "owner-depositor," 113 N.H. at 382, 309 A.2d at 33, and that the relief requested in the Portsmouth case does not involve any risk of depletion of Portsmouth's surplus. Thus, *City Savings Bank* is not on point.

For present purposes, the significance of *City Savings Bank* lies not in its holding, but in its historical analysis. The crux of the historical analysis was:

> "Since the capital of the bank originated with the depositors, it was only logical and equitable that surplus earnings should accrue to their benefit and be distributed to them upon the bank's liquidation. This is a far cry from the banking situation which obtains today, where mutual savings banks are generally financially stable and deposits are federally insured. Having no voice in the management of the affairs of the bank, a depositor today in a mutual savings bank is an 'owner' of the bank and its surplus more in theory than in reality; in most respects, his '"ownership" is only a technical fiction.' Kreider, *Who Owns the Mutuals? Proposals for Reform of Membership Rights in Mutual Insurance and Banking Companies*, 41 U. Cin. L. Rev. 275, 276 (1972). As stated by the bank commissioner in his report to the superior court: 'The depositor in the liquidation of a mutual savings bank receives a share of the surplus [which] is commonly called a "windfall." Receiving the "windfall" is something the depositor neither earned or bargained for.'"

113 N.H. at 381, 309 A.2d at 32. At first glance, this historical analysis appears to bolster the trustees' position. However, the analysis is inapplicable to the present case in several ways. Thus, without

disturbing the holding in *City Savings Bank*, we do not find its reasoning dispositive in the present case.

It does not require an elaborate historical recitation to show that depositors in mutual savings banks are not like shareholders for the purpose of possessing appraisal rights. First, of course, by definition, mutual savings banks have no stock. Second, statutory appraisal rights recognize that minority shareholders can be oppressed by the results of a shareholder vote. Appraisal rights are tied to a *management* right to direct the ultimate disposition of one's property, not just to an ownership right; but mutual savings bank depositors, prior to July 19, 1986, had no voting power to determine any of their bank's affairs. Finally, we point out that denying that depositors are shareholders does not deny that depositors are owners.

The fact that modern depositors have no voice in management is irrelevant to whether the depositors' ownership has become a technical fiction, for depositors in mutual savings banks, including Portsmouth, never had any control over the management of the bank. *See Androscoggin County Savings Bank v. Campbell*, 282 A.2d 858, 860 (Me. 1971); *Hannon v. Williams*, 34 N.J. Eq. (7 Stew.) 255, 258, 38 Am. Rep. 378, 379–80 (1881). Second, the fact that modern deposits are federally insured has had no effect on distributions upon liquidation. Nobody disputes that the depositors would receive cash shares of the surplus if Portsmouth were to liquidate while it was still solvent. Third, as we discuss in greater detail below in the fiduciary duty section of this opinion, the fact that deposits are safer now does nothing to change the trustees' charter obligations to pay out the profits on deposits.

Historically, depositors in a mutual savings bank, like depositors in a commercial savings bank, risked losing their deposits if the bank mismanaged them. *See Cogswell v. Bank*, 59 N.H. 43, 44 (1879). To protect depositors, the legislature required mutual savings banks to set aside part of the profits as a guaranty fund of at least five percent of the total deposits, and permitted trustees to increase the fund as they deemed proper for the best interests of the depositors. RSA 386:9. However, with FDIC protection, a large guaranty fund is no longer necessary. The question, then, is what to do with the profit; that is, whether to reinvest it or distribute it. We take note of the historical fact that, in the nineteenth century and early twentieth century, surplus earnings of mutual savings banks did more than accrue—they were paid out to depositors. For example, the New Hampshire Savings Bank distributed a "special extra dividend" in 1929. 1929 ANNUAL REPORT OF THE BOARD OF BANK COMMISSIONERS 160 (hereinafter ANNUAL REPORT). From 1872 to

1909, the banking statutes required savings banks to pay dividends from earnings. *See* G.L. 170:14 (1878) and P.S. 165:17 (1891); *compare* Laws 1909, 125:1. The 1909 statute made payment discretionary. However, savings banks continued to pay dividends from earnings. For example, in 1910, the Franklin Savings Bank paid a 3.5% dividend per the contract of deposit and a special supplementary dividend of 1.05% from earnings. 1910 ANNUAL REPORT 61. The custom of paying depositors dividends from surplus also led savings banks to pay special dividends upon merging with another savings bank. *See* 1924 ANNUAL REPORT 314 (such a dividend paid to the depositors of the Conway Savings Bank by the Carroll County Trust Company).

Thus, to summarize our discussion of *City Savings Bank*, anything in that decision beyond the issue of cash payment and appraisal rights is dictum. We would add that Justice Souter's discovery that *City Savings Bank* concerned a liquidation and his plea for *stare decisis* do not change the situation. First, the fact that *City Savings Bank* assumed distribution on liquidation would say nothing about whether distribution is denied on other occasions. We do not lightly reject *stare decisis*, but that doctrine refers to the binding power of what one case says on future cases raising the same issue. Second, *stare decisis* does not refer to what is said in a case's Reserved Case (now called a Notice of Appeal) or in the parties' briefs, for few people outside the court and counsel of record read and rely on those materials. To answer, then, whether Portsmouth's depositors own the Bank's surplus, we need look only to the text of the charter, which defines the depositary relationship.

 Thus, we return to the charter. The charter has the force of a contract. *See Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 627 (1819). The interpretation of a contract is a matter of law for this court to decide. *Baker v. McCarthy*, 122 N.H. 171, 174–75, 443 A.2d 138, 140 (1982). It is axiomatic that we give a contract the meaning intended by the parties when they wrote it. *Thiem v. Thomas*, 119 N.H. 598, 602, 406 A.2d 115, 118 (1979). Section 2 of Portsmouth's charter provides in relevant part that "the net income and profits of all deposits of money received by said corporation shall be paid out and distributed in just proportions, among the several persons by or for whom the said deposits shall have been made . . . ."

 Clearly this language is mandatory in nature, in view of the fact that in New Hampshire it is well established that the word "shall" acts as a command, in the absence of legislative history to the

contrary. *Appeal of Concord Natural Gas Corp.*, 121 N.H. 685, 691, 433 A.2d 1291, 1295 (1981); *cf. Gordon v. Public Service Co.*, 101 N.H. 372, 374–75, 143 A.2d 428, 430 (1958). Nor do we see any reason to construe this charter in favor of the Bank as against the depositors. "Ordinarily charters and agreements of association are drawn by interested persons who may be trusted to look out for themselves and there is no reason why the rules of construction should be modified in their favor." 7A W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 3645, at 281 (1978 rev. ed.).

Furthermore, in 1823, when the legislature chartered the Portsmouth Savings Bank, the third person auxiliary usage of "shall" was a mandatory directive. At that time, the word "will," except when used in the first person, merely implied futurity, rather than promise, determination, or threat. R. NUTTING, A PRACTICAL GRAMMAR OF THE ENGLISH LANGUAGE 52–53 (1828); W. SKEAT, AN ETYMOLOGICAL DICTIONARY OF THE ENGLISH LANGUAGE 544 (1882). The current popular usage of "shall" as a slightly affected expression of futurity, or as an exhortation rather than a command, with "will" used customarily to denote both futurity and volition, is a recent development. *Compare* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1189–90 (1969) *with* THE NEW CENTURY DICTIONARY 1682–83 (1943), which still retains the old definition.

██ ██ What then is the charter's mandate? "The net income and profits . . . shall *be paid out*" (emphasis added). To whom shall it be paid? Here the charter says the "persons by or for whom the said deposits shall have been made." What does this mean? We construe the terms of a contract according to the usage of its writers under the circumstances surrounding the formation of the contract. In 1823, mutual savings banks in New Hampshire and elsewhere existed by definition solely for the benefit of their depositors. If the depositors were not to receive reasonable payments from surplus, then someone else would, which of course contradicts the definitional premise. Therefore, we conclude that "income and profits" includes "surplus."

Justice Souter urges a distinction between current and past depositors. He believes that the charter refers *only* to persons by or for whom *current* deposits shall have been made. If we apply this interpretation literally, the Bank would have to maintain separate investments for each depositor, else each depositor would receive income derived from other deposits. That practice would be absurd. Investments are made on aggregate deposits. The only sensible way to read "persons by or for whom the said deposits shall have been

made" is that it means depositors as a group of record at any given time. The only logical alternative is that a withdrawing depositor may claim his or her share of the surplus, but this apparently has never been the practice of any mutual savings bank. In this light, the usage of the industry determines the meaning of the contract. In the absence of any contractual specification of when payments are to be made, we infer payment in reasonable amounts at reasonable intervals.

The proposed plan does not preserve these charter rights. The plan transfers Portsmouth's net worth, including the value of its surplus, to Amoskeag. The surplus is put into a liquidation account for the Portsmouth depositors. However the liquidation account is controlled by Amoskeag and will be distributed only upon liquidation. Thus, a vested right to distributions during the solvency of the Bank becomes an inchoate right that vests upon an unlikely contingency. Furthermore, the liquidation account is depletable. The experience of Amoskeag Savings Bank shows how drastically such an account can dissipate. Upon conversion, Amoskeag Savings Bank established a liquidation account equal to its depositors' net worth of $54,680,000 as of November 30, 1982. However, twenty-five months later, on December 31, 1984, the liquidation account was only $27,116,000. *See* Amoskeag Registration Statement Form S-1, 8/16/85, at F-13.

The subscription rights to Amoskeag stock, proposed pursuant to Tru 506.02, also fail to preserve the depositors' rights in the surplus. The surplus is acquired by Amoskeag. If the Portsmouth depositors wish to retain their equity in it, they must purchase Amoskeag stock. The only right given by Tru 506.02 is a subscription right to purchase Amoskeag stock before it is offered to the public.

The defendants have advanced two arguments against the continued force of the charter. First, they argue that, in actual modern banking custom, the depositor in a mutual savings bank is no different than the depositor in a commercial bank. They point out that State and federal statutes and regulations have blurred the difference between the various types of savings banks. Their second argument is that, even if the charter is constitutionally protected against subsequent State law, Portsmouth has brought itself under the legislature's power by accepting the benefits of various general banking laws. We are not persuaded by either argument.

The State law claims regarding interest payments of savings banks and regarding the authorization of the BTCI to adopt conversion policies modeled after the Federal Home Loan Bank Board regulations depend upon the success of the claim that Portsmouth

has informally surrendered its charter. Thus, we treat the surrender argument first.

At the outset, we note that there is no statement in the Bank's brief of what statutory benefits Portsmouth has accepted which were beyond the scope of its charter powers. We echo the sentiments of *Hammons v. Watkins*, 33 Ariz. 76, 85–86, 262 P. 616, 619 (1927), that merely continuing to do business as a Bank cannot constitute acceptance. However, the record shows two amendments to the charter, one expanding the power of the Bank to own real property necessary for the conduct of its affairs, and the other enabling it to pay its officers and employees. Neither of these in any way relates to the nature of the Bank's relationship with its depositors. Without a clearer, stronger record or without persuasive authority, we will not tamper with section 2 of the charter on the basis of unrelated, isolated changes.

As authority for the rule that a corporation surrenders its charter when it later accepts the benefits of general legislation, we are referred only to 7A W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 3677 (1978 rev. ed.). Fletcher cites several cases, only two of which concern corporations chartered in a State that had no constitutional or statutory reserved power at the time the charter was granted: *Golconda Mining Corp. v. Hecla Mining Co.*, 80 Wash. 2d 372, 494 P.2d 1365 (1972), and *Louisville & Nashville Railroad Co. v. State ex rel. Gray*, 154 Ala. 156, 45 So. 296 (1907). On this point, *Golconda* in turn cites a previous edition of Fletcher. More importantly, *Golconda* dealt with a corporation whose charter would have expired, but was given new life by the legislature which granted its application under a new general statute bestowing corporate immortality. Further, the company had metamorphosed into a new entity by merging with another company under the new corporations statute. The court's holding was that "the renewal of the corporate existence constituted a new contract with the state and subjected the corporation to the laws in effect at the time of renewal." *Golconda, supra* at 380, 494 P.2d at 1370. The Alabama case and a similar case in Utah, *Brewer v. Pleasant Creek Irrigation Company*, 18 Utah 2d 192, 417 P.2d 970 (1966), are based on State constitutional provisions conditioning the availability of statutory benefits to corporations chartered prior to the State's reservation of power to amend or repeal corporate charters on the acceptance by those corporations of the State's reserved power. Thus, *Golconda* is based on circumstances categorically different from ours, and *Louisville & Nashville Railroad Co.* is based on State

law which has no counterpart in New Hampshire. We have found no other authority on this point.

■■■ Thus we come to the question of how federal regulation of banking affects the charter. Unlike State law, federal law is not affected by the Contract Clause. U.S. CONST. art. I, § 10. The Supremacy Clause, U.S. CONST. art. VI, makes it clear that federal law preempts the charter if the two are in conflict. Thus, if federal law prohibits mutual savings banks from paying their depositors dividends from surplus beyond a fixed interest rate ceiling applicable to all mutual savings banks, then the only rights Portsmouth depositors may enforce are the inchoate rights defined in the BTCI rules.

Until 1966, the Federal Deposit Insurance Corporation was authorized to regulate the rates of interest or dividends payable on time and savings deposits by insured banks that were not members of the Federal Reserve System. However, those regulations were to "be consistent with the contractual obligations of such banks to their depositors." See 12 U.S.C. § 264(v)(8) (1940), retained by 64 Stat. 893 (1950). No statute authorized the Federal Reserve Board to set interest rates on nonmember banks. In 1950, the FDIC promulgated interest rate ceilings for savings banks, but specifically exempted mutual savings banks. 12 C.F.R. § 329.0 (1950), see 15 Fed. Reg. 8,640 (Dec. 6, 1950).

The first congressional authorization to regulate mutual savings bank dividends was enacted by section 3 of Pub. L. No. 89–597, 80 Stat. 824 (1966), now codified at 12 U.S.C. § 1828(g)(1) (1982). The FDIC's power was not limited by contractual obligations of the mutual savings banks. Five days after the passage of Pub. L. No. 89–597, the FDIC added 12 C.F.R. § 329.7 (1966), limiting dividend rates payable by mutual savings banks, and compelling all insured nonmember mutual savings banks to modify their deposit contracts to conform to § 329.7. See 12 C.F.R. § 329.3(b) (1966). Thus, at the time Portsmouth applied for approval of its conversion-acquisition plan, its depositors' contractual right to a direct distribution of surplus was preempted by federal regulation.

Nonetheless, on March 31, 1980, Congress enacted the Depository Institutions Deregulation Act of 1980, codified at 12 U.S.C. §§ 3501–3524 (1982), which fixed an expiration date of March 31, 1986, upon the authority of both the Federal Reserve Board and the FDIC to regulate interest rates and dividends. See 12 U.S.C. § 3506(b)(2), (3), (4), (5) (1982). Of course, with the federal law withdrawn, State law reemerges. The charter controls once again. In any event, RSA

386:10, I, authorized savings banks to pay dividends, although, along with RSA 386:9, it limits the ability of banks to imperil the depositor by paying dividends which are not supported by an adequate guaranty fund.

 The trustees applied to the board on July 18, 1985. The board issued its opinion on March 31, 1986, the very day when 12 C.F.R. § 329.7 (1986) expired. The question for the board, then, was whether a right to participate in an inchoate liquidation account, even assuming that account to be non-depletable, is fair to depositors who are on the very cusp of regaining the enjoyment of contractual rights to distributions from surplus during the solvency of the Bank. We believe this can only be answered by stating that the plan was unfair.

The foregoing analysis is sufficient basis to reverse the board. However, the depth of the plan's unfairness is even more apparent upon consideration of the trustees' fiduciary duty. We turn now to that issue.

B. *Fiduciary Duty*

 The board believed the existence of a fiduciary duty was irrelevant "to the review criteria established by Tru 505.03, 502.01, and the remainder of Tru 500." Memorandum Opinion and Order, appendix A. This analysis is too narrow because the question of fairness under Tru 505.03 depends by definition on the relationship between the parties. What fairness demands of a person charged with an ordinary duty of care is less than what fairness demands of one in whom a fiduciary trust has been reposed. A fiduciary has a "duty, created by his undertaking, *to act primarily for another's benefit* in matters connected with such undertaking." BLACK'S LAW DICTIONARY 563 (fifth ed. 1979) (emphasis added). BLACK'S goes on to say that a fiduciary may not "prejudice the other except in the exercise of the utmost good faith and with the full knowledge and consent of that other, . . ." *Id.* at 564. It is not enough for one vested with such a duty merely to avoid fraud, or to protect the interests of his beneficiaries adequately within the technical letter of the law. The standard of care is a high one indeed, as Chief Judge Cardozo wrote:

> "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is

then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

*Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (quoting *Wendt v. Fisher*, 243 N.Y. 439, 444, 154 N.E. 303, 304 (1926)).

■ We find a fiduciary relationship is required by the charter when the charter is read in light of *Lash v. Cheshire County Savings Bank, Inc.*, 124 N.H. 435, 474 A.2d 980 (1984).

In *Lash* we adopted a rule that

"[a] fiduciary relation does not depend upon some technical relation created by, or defined in, law. It may exist under a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence."

*Id.* at 439, 474 A.2d at 982 (quoting *Ford v. Guarantee Abstract & Title Co.*, 220 Kan. 244, 261, 553 P.2d 254, 267–68 (1976) (quoting *Lindholm v. Nelson*, 125 Kan. 223, 264 P. 50 (1928))). Section 2 of the Portsmouth charter reads in pertinent part:

"And be it further enacted that the said corporation shall be capable of receiving from any person or persons disposed to enjoy the advantages of said Savings' Bank any deposit, or deposits of money or other personal property, and to use, manage, and improve the same for the benefit and advantage of the person or persons by, or for whom the same shall be deposited respectively; . . . ."

This charter typifies the relationship between a depositor and the trustees of a mutual savings bank in the absence of 12 C.F.R. § 329.7 (1986). The depositor entrusts funds to the bank. The bank does not invest them for its own profit, but for the depositor's benefit. *See State v. National Banks*, 75 N.H. 27, 30, 70 A. 542, 544 (1907). Currently, this relationship is embodied in the federal law definition of mutual savings banks: "a bank without capital stock transacting a

savings bank business, the net earnings of which inure wholly to the benefit of its depositors . . . ." 12 U.S.C. § 1813(f) (1982). It is also recognized by current encyclopedists: "[mutual savings bank] depositors are both creditors with respect to their investments and owners with respect to all distributed earnings on investments. . . ." J. NORTON AND S. WHITLEY, BANKING LAW MANUAL § 1.03[3][b] (1986).

This relationship does not depend on the size of the deposit. The greater wealth of modern depositors is irrelevant. Neither does it depend on the financial naiveté of the depositor. Although some mutual savings banks were started expressly for nineteenth-century widows, orphans, and others deemed incapable of managing their own finances, the duty of the trustees to improve the deposit need not arise from the depositor's necessity. In any event, Portsmouth's charter entitles any person to be a depositor. Furthermore, the duty to improve does not arise from the need to protect the deposit, so FDIC and statutory guaranty funds are also irrelevant. In short, the economic changes of this century do not affect the fundamental nature of the depositary relationship in a mutual savings bank. This is the conclusion reached by the Supreme Judicial Court of Maine in *Androscoggin Savings Bank v. Campbell*, 282 A.2d 858, 860–61 (Me. 1971); *see also In re Dissolution of Springfield Savings Society*, 12 Ohio App. 2d 120, 126, 231 N.E.2d 314, 318 (1966); *Application of Howard Savings Institution of Newark*, 32 N.J. 29, 39, 159 A.2d 113, 118–19 (1960); *People v. Franklin Nat. Bank of Franklin Square*, 305 N.Y. 453, 461, 113 N.E.2d 796, 799 (1953), *rev'd on other grounds*, 347 U.S. 373 (1954).

That the trustees and officers of a savings bank owe fiduciary duties to depositors is beyond question. *See* RSA 384:5 (officers, directors, and trustees to take oath of good faith); *State ex rel. Moore v. State Bank of Hallsville*, 561 S.W.2d 722, 724–25 (Mo. Ct. App. 1978) (directors of a bank have a fiduciary relationship with depositors, for whom they are trustees and agents). Prior to the federal intervention into banking, our law was that mutual savings bank trustees owed a fiduciary duty. *See, e.g., Cogswell v. Bank*, 59 N.H. 43, 44 (1879); *see also Alexiou v. Bridgeport-Peoples' Savings Bank*, 110 Conn. 397, 401, 148 A. 374, 375–76 (1930); *In re Wilkins' Will*, 131 Misc. 188, 226 N.Y.S. 415 (1928); *Barrett v. Bloomfield Savings Institution*, 64 N.J. Eq. (19 Dick.) 425, 433, 54 A. 543, 546 (1903), *aff'd*, 66 N.J. Eq. (21 Dick.) 431, 57 A. 1131 (1904); *Savings Institution v. Makin*, 23 Me. 360 (1844). In the modern era of banking, too, this court has found a fiduciary relationship, albeit in a context different from that of our present case. *Peterborough Sav-*

*ings Bank v. King,* 103 N.H. 206, 208, 168 A.2d 116, 117 (1961) ("directors of savings banks stand in the position of trustees as to their depositors . . ."). *See also Devane v. Troy Savings Bank,* 101 A.D.2d 634, 635, 475 N.Y.S.2d 540, 542 (1984) (in context of self-dealing, trustees of a savings bank are "bound by a high fiduciary duty"); *Selective Builders v. Hudson City Savings Bank,* 137 N.J. Super. 500, 509, 349 A.2d 564, 569 (1975); *State v. Vars,* 154 Conn. 255, 262–63, 224 A.2d 744, 748 (1966).

 Our discussion of the trustees' fiduciary duty has been based on the charter, because the petitioners have built their case on the charter. However, we believe RSA 386:10, I, compels the same result. The statute has resurfaced with the repeal of federal regulation. It permits the trustees of mutual savings banks to pay dividends to their depositors and places no maximum on the dividends payable by mutual savings banks, such as Portsmouth, both that have a guaranty fund greater than five percent of their total deposits and whose total assets exceed their total deposits by at least five percent.

The question, then, is whether the trustees of a financially healthy bank violate their fiduciary duty to the depositors when they permanently foreclose a new statutory right to dividends by transacting a conversion-acquisition in accordance with Tru 506.02. The prescribed manner of transacting conversion-acquisitions is in tension with the fiduciary obligation to protect the statutory rights to dividends in the reasonable exercise of the trustees' discretion as fiduciaries. This tension, however, is resolved by the requirement in Tru 506.02 that the conversion conform to all the requirements of Tru chapter 500. Thus, the transaction must be fair to the depositors as per Tru 505.03. The fiduciary duty to protect statutory rights supersedes the prescribed manner of conversion.

This statutory right undercuts the objection that our opinion exposes mutual savings banks—or at least the three chartered before 1842—to crippling demands for the payment of dividends. The present State statutory scheme grants that right to depositors of every mutual savings bank far more effectively than anything in our reading of the charter does. We presume that if the legislature fears that the present statute unduly jeopardizes the financial health of mutual savings banks' surpluses, it can revise RSA 386:10, I.

 Thus, in summary, even if we accept the applicants' argument in their brief that the proposed plan protected the interests of depositors in a manner consistent with the law, the plan nevertheless does not discharge the fiduciary duty of care owed by the trust-

ees to their depositors. If mere compliance with the technical letter of the law were enough, fiduciary law would be just so much empty doctrine, devoid of any substance. It might be economically efficient for the bank to convert as planned, and in general it might be economically efficient for the BTCI to encourage such conversions. Nonetheless, the conversion violates the rights of Portsmouth depositors under their charter, which predates the State's reservation of power to alter it, and which has survived the two decade interlude of federal regulation. Only by vacating the board's order does this court discharge its traditional equitable obligation to maintain the conduct of those bound by fiduciary ties "at a level higher than that trodden by the crowd." *Meinhard v. Salmon*, 249 N.Y. at 464, 164 N.E. at 546.

*Reversed.*

THAYER, J., did not sit; NADEAU, J., superior court justice, sat by special designation pursuant to RSA 490:3, and concurred specially; BROCK, C.J., and SOUTER, J., dissented.

NADEAU, J., concurring specially: I concur in the per curiam opinion vacating the board's order granting Portsmouth Savings Bank's (Portsmouth or Bank) application for conversion from a mutual savings bank to a stock form of ownership and for its simultaneous acquisition by Amoskeag Bank Shares, Inc. The plan as submitted is unfair to the depositors of Portsmouth. The per curiam decision holds that the Bank's charter vests rights in Portsmouth's depositors to proportionate distributions of bank surplus in reasonable amounts and at reasonable intervals. Such a standard should not be unfamiliar to persons, such as bank trustees, entrusted with fiduciary and management responsibilities. Where questions arise, they may be submitted to the superior court, which regularly applies a reasonableness standard in a variety of contexts.

I write separately, further, to indicate my opinion that even in the absence of a finding of a vested property right, the fiduciary obligations of bank trustees compel them to advance the interests of depositors when structuring such transactions. Plan fairness, in my opinion, may never be defined so as to supersede these obligations.

While the trustees' authority to propose a conversion-acquisition plan arises from the board's statutorily-based regulations, their duty to compose one that was beneficial to depositors arose by virtue of their common law and statutory fiduciary obligations. *Cogswell v. Bank*, 59 N.H. 43 (1879); RSA 384:5. This court has long recognized that mutual savings bank trustees owe such a duty to depositors

independent of any additional contract right or statutory entitlement. *Cogswell supra.* As beneficiaries of this duty, the depositors of Portsmouth are entitled to expect the trustees to represent and pursue their best interests in all management and policy decisions.

As the per curiam opinion has noted, the Portsmouth charter clearly expresses the fiduciary relationship obtaining between the trustees and the depositors. The assertion of such a relationship in the banking context is not novel to this court. On prior occasions, it has ruled that a bank "is held to a higher standard because it owes a fiduciary duty to its depositor." *PK's Landscaping, Inc. v. N.E. Telephone Co.*, 128 N.H. 753, 758, 519 A.2d 285, 288 (1986); *see also Exeter Banking Co. v. N.H. Ins. Co.*, 121 N.H. 1083, 438 A.2d 310 (1981). The court has also characterized a mortgagee's duty of good faith and due diligence as "essentially that of a fiduciary." *Murphy v. Financial Development Corp.*, 126 N.H. 536, 541, 495 A.2d 1245, 1249 (1985). In fact, this court has recognized and significantly contributed to the trend of expanding the concept of fiduciary duty in order to prevent unjust enrichment of banks. *Lash v. Cheshire County Savings Bank, Inc.*, 124 N.H. 435, 438, 474 A.2d 980, 981 (1984).

Furthermore, the court has recently held that trustees of the State retirement system owe a fiduciary obligation to its members and beneficiaries. *N.H. Retirement System v. Sununu*, 126 N.H. 104, 109, 489 A.2d 615, 619 (1985). The statute creating the system, upon which the court based its conclusion, bears remarkable similarity to the Bank's charter in its simultaneous provision for corporate powers and trust responsibilities. RSA 100-A:2; Laws 1823, 27:2. Importantly, the decision also established that a fiduciary obligation, once found to exist, may not be undermined by executive branch review of trustee decisions. Presumably, the fiduciary duties themselves may not be eliminated by administrative regulation.

This body of New Hampshire law has not been displaced by N.H. Admin. Code Tru chapter 500. Nor are its directives affected by the court's decision in *In re City Sav. Bank*, 113 N.H. 378, 309 A.2d 31 (1973), as is clear from the per curiam analysis. Rather, New Hampshire fiduciary law, to which the Bank's trustees are subject, compels those so designated to serve the interests of their beneficiaries with fidelity and loyalty. In devising the plan of conversion-acquisition, the trustees were duty bound, not merely to preserve a presently enjoyable property interest, as Justice Souter's dissent claims, but to act solely in furtherance of the *general* interests of depositors. Who else are the trustees directed, by charter or statute,

to serve? And yet the trustees failed to make *any* provision for the benefit of depositors under the plan.

Clearly then, the starting point for any review of a plan of such significance to depositors, especially in light of the regulatory requirement of fairness to them, is the fiduciary obligation of the trustees. Whether the board intended to incorporate or ignore this obligation in its regulatory scheme should not deter this court from its responsibility to use its equitable powers to avoid injustice. This court should not permit bank trustees to derogate their fiduciary obligations. Where a fiduciary's judgment manifests an abuse of discretion, as it does here, it may be set aside. *Morse v. Trentini*, 100 N.H. 153, 121 A.2d 563 (1956).

While business practices in the thirteen years since *City Savings* have changed dramatically, the fiduciary obligation of mutual savings bank trustees has remained constant. The fact that banks may now, by statute, be acquired without liquidation does not destroy that obligation, which exists independent of any specific property right. The obligation itself is the basis of depositors' action in this case; no separate contract or statutory provision need be cited to support depositors' claims. This is the heart and soul of fudiciary law. The relationship is the source of the right; its existence alone calls forth a higher duty. *Lash v. Cheshire County Savings Bank, Inc. supra.*

The Bank's trustees ignored *all* legal and practical precedents which support depositor compensation, including the right of depositors to surplus upon solvent liquidation. They ignored, as well, current banking practice followed in nearly all similar transactions which benefit depositors financially. In its approval of the trustees' plan, the board apparently considered irrelevant the fiduciary duty of the trustees to protect the general interests of depositors. If the board had appreciated the trustees' overriding fiduciary obligation to the Bank's depositors, it could not have reached the conclusion it did. Merely preserving the value of deposits and creating a liquidation account do not make an unfair plan fair.

BROCK, C.J., dissenting: I dissent from the majority's opinion in this case. While I agree with the majority's conclusions on standing and jurisdiction, the approval by the board of trust company incorporation (board) of the conversion-acquisition plan was, in my view, neither unreasonable nor unlawful for the reasons set forth below.

Twelve corporators of the Portsmouth Savings Bank (Bank) challenge the fairness of the proposed conversion-acquisition on several grounds. They argue that the depositors will be unfairly divested of

their vested ownership interest in the surplus of the Bank, thus rendering unto Amoskeag Bank Shares, Inc. (Amoskeag) a windfall and thereby violating the Bank's charter; that the board erroneously failed to examine whether Portsmouth's trustees had fulfilled their fiduciary obligations to depositors; and that the lack of information on the alternative of a stand-alone conversion prevented the board from adequately considering the plan.

It is well-settled that this court will set aside the board's decision only if it is "clearly unreasonable or unlawful[.]" RSA 541:13. *See also Appeal of Incorp's of Manchester Sav's Bank*, 120 N.H. 129, 133, 412 A.2d 421, 423 (1980). We do not sit as a fact-finder or substitute our policy judgment for that of the board. Further, all findings of fact by the board are "deemed to be prima facie lawful and reasonable[.]" RSA 541:13. *See also Appeal of Portsmouth Savings Bank*, 123 N.H. 1, 6, 455 A.2d 1023, 1026 (1983). Keeping these standards in mind, I proceed to a substantive examination of the board's order.

The board stated in its decision that the ownership interests of depositors in a mutual savings bank are quite limited, consisting of creditors' rights and rights to distribution of accumulated surplus in the event of liquidation of the bank. The board ruled that the creation of a liquidation account under N.H. Admin. Code Tru 502.05 protects the depositors' rights to a "distribution of surplus upon liquidation[.]" In addition, the depositors' rights as creditors are protected, according to the board, in that "the plan . . . [preserves] the value of [the depositors'] accounts." The board also noted that the depositors will receive the right to purchase stock of Amoskeag and found that the failure to provide subscription rights in Portsmouth stock did not render the plan unfair.

Section 2 of Portsmouth's charter provides in part that "the net income and profits of all deposits of money received by [Portsmouth] shall be paid out and distributed in just proportions, among the several persons by or for whom the said deposits shall have been made, . . ." Laws 1823, 27:2. In order to comprehend what is at stake here, one must understand the conceptual battleground upon which the parties contend in this case, to wit: different views of the nature and source of the depositors' rights to a distribution of the Bank's surplus. The dissident corporators claim that the present depositors of the Bank own the Bank, citing *Paulsen v. Commissioner*, 469 U.S. 131 (1985), and that they are therefore entitled to protection of their property interest. They argue that the trustees' conversion-acquisition plan does not adequately protect the depositors' vested property rights and gives Amoskeag a windfall.

Portsmouth and Amoskeag, relying upon the decision of this court

in *In re City Sav. Bank*, 113 N.H. 378, 309 A.2d 31 (1973), contend that the interest of the depositors in the surplus or net worth of the Bank is inchoate, or a "'technical fiction.'" *Id.* at 381, 309 A.2d at 32. They further argue that, whatever interest the depositors may have in the Bank, that interest is preserved by the plan's provision for a liquidation account under Tru 502.05.

In its decision, the board concluded that the ownership interest of depositors in mutual savings banks is, in general, theoretical, relying upon, *inter alia, In re City Sav. Bank, supra* at 381, 309 A.2d at 32; *Society for Savings v. Bowers*, 349 U.S. 143, 150 (1955); and *York v. Federal Home Loan Bank Bd.*, 624 F.2d 495, 499–500 (4th Cir.), *cert. denied*, 449 U.S. 1043 (1980). Further, depositors in such institutions retain, in addition to creditors' rights, rights to distribution only upon the Bank's liquidation. Thus, the board concluded that the proprietary interest the depositors have in the Bank or its surplus is adequately protected by the creation of a liquidation account pursuant to the board's rules and the extension of an opportunity to eligible depositors to purchase stock of Amoskeag through the provision of priority subscription rights to them.

In *Society for Savings v. Bowers supra,* the United States Supreme Court characterized the interest of depositors in the surplus of mutual savings banks generally as an interest in

> "primarily a reserve against losses and secondarily a repository of undivided earnings. So long as the bank remains solvent, depositors receive a return on this fund only as an element of the interest paid on their deposits. To maintain their intangible ownership interest, they must maintain their deposits. If a depositor withdraws from the bank, he receives only his deposits and interest. If he continues, his only chance of getting anything more would be in the unlikely event of a solvent liquidation, a possibility that hardly rises to the level of an expectancy. It stretches the imagination very far to attribute any real value to such a remote contingency, and when coupled with the fact that it represents nothing which the depositor can readily transfer, any theoretical value reduces almost to the vanishing point."

*Bowers, supra* at 150; *see also In re City Sav. Bank, supra* at 381, 309 A.2d at 32.

I would hold that this general characterization of the interest of depositors in mutual savings banks applies to the depositors of Portsmouth except to the extent that the Bank's charter might be

interpreted as giving them a different or greater interest. The charter provision relied on by the petitioners to establish that they have a greater interest is section 2, wherein it is stated that "the net income and profits of all deposits of money received by said corporation shall be paid out and distributed in just proportions, among the several persons by or for whom the said deposits shall have been made, . . ."

The issue, then, is whether provision for a liquidation account in the trustees' plan satisfies, or is in conflict with, the language of the Bank's charter. If not inconsistent with the charter language, no more need be said. If, on the other hand, a conflict exists, petitioners allege that an issue of fairness to Portsmouth's depositors arises. It should be noted that the petitioners' argument rests solely on their claim that such a violation of the charter as they believe will occur renders the plan not "fair" to the Bank's depositors within the meaning of Tru 505.03.

The charter provision does not state when distributions are to be made and is at least ambiguous in its usage of the term "shall" as to whether net income and profits earned on deposits of others must be distributed to depositors of record at any given time. The only change in interest of the depositors through the creation of a liquidation account is that no distribution of Portsmouth's surplus can be made except in the event of a liquidation. I do not believe that such a limitation upon the rights of depositors, particularly in view of the general recent background of depositor ownership interests in mutual savings banks, is of such clarity as to render the transaction unfair within the meaning of Tru 505.03, nor do I believe that it violates the language of the charter.

I am also mindful of the fact that, at present, insurance by the Federal Deposit Insurance Corporation (FDIC) largely protects depositors against losses of their deposits. The modern depositor in a mutual savings bank thus risks virtually no loss of his or her deposit, unlike the depositor in its nineteenth-century counterpart. By statute at that time, deposits could be reduced if the value of the assets of the bank dropped below the total amount of deposits. *See* Laws 1874, 71:10. Thus, the danger of loss that existed in the nineteenth century has no relevance today.

Taking all of these factors into account, I would hold that the language in the Portsmouth charter does not give the institution's present depositors vested property rights in the Bank's surplus. Because the rights of depositors to Portsmouth's surplus are not vested, but rather inchoate, subject to the exercise of discretion by the trustees, I conclude that depositor rights in the surplus are fully

protected by the liquidation account established pursuant to regulations promulgated by the board and the priority subscription rights described in the majority's opinion. This determination, however, does not end my inquiry.

The corporators' next claim is that the board erred when it ruled that the existence or not of a fiduciary duty on the part of the trustees to the Bank's depositors was irrelevant to its application of the review criteria set forth in Tru chapter 500. Tru 505.03, titled "Review by the Board," provides that

> "[t]he board shall review each materially complete application and issue an order of approval if it finds that the plan of conversion is fair to the depositors of the mutual savings bank and that insurance of accounts will remain in full force and effect subsequent to the conversion. In connection with its review, the board may require such changes in the materials submitted in support of the application as are necessary to insure full and adequate disclosure of all material factors relating to the conversion prior to issuance of the board's order of approval. Such order of approval shall also encompass the applicant's proposed amended stock articles of agreement or legislative charter."

The board's rules do not define the term "fair." Thus, the question becomes whether the failure of the board to consider the fiduciary duty, if any, owed by Portsmouth's trustees to the depositors was erroneous.

I would hold that the board was correct as a matter of law in ruling that the existence or non-existence of a fiduciary relationship was irrelevant to the review criteria established in Tru chapter 500. Under its rules, the board had only to determine whether the proposed conversion-acquisition was fair to the Bank's depositors. The board so found, and I find no basis for disturbing its finding. The plan as proposed complied with all applicable rules, and the trustees presented sufficient evidence from which the board could make the requisite fairness determination, including evidence that the trustees had considered other alternatives and had rejected them. As implied by board member Thomas in her special concurrence, issues related to the alleged breach of such a fiduciary duty as may exist are more appropriately addressed in another forum. Claims for the breach of a fiduciary duty are traditionally cognizable in equity, and beneficiaries in the normal trust situation look to courts to protect their rights and redress infringements thereof. Such remedies

"are equitable in origin and depend upon the application of equitable principles." G. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 870, at 97 (2d ed. rev. 1982). Thus, given the responsibility of the board to determine only the fairness of the plan to depositors, and given the existence of a remedy in damages for alleged breaches of fiduciary duty in the superior court, I would hold that the board did not err in its refusal to examine the fiduciary relationship issue in this context.

The petitioners further argue that since the board did not have adequate information on the merits of a stand-alone conversion (*i.e.*, a conversion from a mutual to a guaranty bank alone with no subsequent acquisition), the hearing process was rendered unfair. In addition, they allege that the failure of the trustees to obtain information on such a transaction, and the board's failure to require it, represent a breach of fiduciary duty and an abuse of discretion, respectively. I disagree. Disregarding the fact that the petitioners presented no evidence below on either the feasibility or preferability of a stand-alone conversion, the failure to consider such an option does not render the proposed transaction or process unfair. The rules of the board do not require it to evaluate transformative options available to banks such as Portsmouth, but rather require it to evaluate the fairness of a proposed plan put before it. In other words, the statute and rules require not that the board compare a given plan to the universe of available alternatives, but rather that it evaluate the merits of the plan submitted to it. Thus, determining fairness in a given case requires a finding that the plan presented is itself fair to depositors, not that it is the best among a clutch of theoretical or potentially practical alternatives.

As to the asserted duty of the trustees to consider alternatives to conversion-acquisition prior to the presentation of any plan to the board, there was evidence before the board that the trustees had considered and rejected such options, such as the affidavit of Maurice J. Murphy, Jr., Chairman of the Board of Directors of the Bank, in which he stated that "a straight conversion probably was not feasible or desireable [*sic*] because even in the stock form the Bank would still be too small to effectively compete with the larger institutions in the ever changing marketplace." The affidavit of William S. Bushnell, Chairman, President and Chief Executive Officer of Amoskeag, stated that "Portsmouth is worth more as a subsidiary of Amoskeag than it is by itself[,]" and enumerated the benefits which will accrue to Portsmouth through its affiliation with Amoskeag in terms of "new services and programs made possible by the affiliation." The affidavit of Thomas P. Duke, managing director of Tri-

dent Financial Corporation, an investment banking and consulting firm hired by Portsmouth and Amoskeag to make an appraisal in connection with the proposed plan, supported the claims made by Mr. Bushnell.

Many of these same points were raised at the hearing held by the board. Moreover, the hearing itself provided a meaningful opportunity for the dissident corporators to create a record and to cross-examine the Bank's representatives and others as to what options had been considered and why they were rejected. *See Appeal of Portsmouth Savings Bank*, 123 N.H. at 4, 455 A.2d at 1025. Thus, in my view, there was sufficient evidence before the board that the trustees' consideration and choice of the particular plan submitted to the board was both reasonable and fair, especially in view of the fact that the Bank's depositors have no vested rights in the Bank's surplus.

In summary, then, I would hold that the board's determination that the proposed plan was fair to depositors is supported by the record before it. I therefore respectfully dissent.

SOUTER, J., dissenting: I respectfully dissent from part III of the majority opinion. The majority conclude that the plan for Portsmouth Savings Bank's conversion from mutual to stock form, with its immediate acquisition by Amoskeag Bank Shares, Inc., is unfair to Portsmouth's depositors as a matter of law under N.H. Admin. Code Tru 505.03, and its adoption by Portsmouth's trustees a violation of their fiduciary duty to the Bank's depositors. The majority rest their conclusions on the Bank's charter, and from its terms they proceed by a line of reasoning to which they find no impediment in existing law.

I, on the contrary, find the charter provisions inadequate to premise the majority result, and prior authority at odds with the majority holding. I dissent from both the result and the reasoning, which calls into question the legality of the most frequently used plan for stand-alone conversions of mutual savings banks, and which invites demands for cash distributions from surpluses that may have been accumulated over a century or more. As we face the likelihood of further litigation to probe the doubtful consequences of today's decision, it behooves us to recognize that the uncertainty engendered by the majority opinion is magnified by an institutional weakness in the court's procedure, which we should acknowledge and could mitigate in this case by respect for existing precedent.

The statements of fact in the majority opinion and the Chief Justice's dissent obviate the need for anything but a précis here. Under

the plan proposed by Portsmouth's trustees and approved by a majority of the Board of Trust Company Incorporation, Portsmouth would first convert from a mutual to a stock (*i.e.,* "guaranty") form of corporate organization. Portsmouth would then issue all its stock to Amoskeag in exchange for cash equal to eighty percent of the proceeds of a new issue of Amoskeag stock, as to which Portsmouth's depositors would have preferential subscription opportunities. Because of the remote possibility that Portsmouth could be dissolved at some future time after the conversion, the plan would also mandate the creation of a liquidation account to preserve the contingent interests of Portsmouth's preconversion depositors in the Bank's preconversion surplus. In the event of such a liquidation, preconversion depositors who remained depositors until liquidation would be paid the same amounts that they would have been entitled to receive if a liquidation had occurred at a time shortly before the conversion, as pro rata shares of surplus computed with respect to preconversion deposits not subsequently withdrawn. Although "surplus" as used in the record before us is not defined as a technical accounting term, it is clear that it refers to a net worth of some seventeen million dollars accumulated from earnings over the course of the Bank's history.

Although the facts can thus be given briefly, the statement of issues calls for more extended care. In the language of the board's applicable regulation, the plan must be "fair to the depositors." Tru 505.03. All parties to this appeal have approached the question of what is "fair" in terms of the consistency of the plan with the depositors' legally cognizable property interests. Proceeding on this analysis, the appellants in their brief have identified two features of the plan as objectionable. First, it "would result in a windfall to Amoskeag . . . of the [Portsmouth] net surplus of Seventeen Million Dollars without any corresponding benefit being conferred upon the depositors of . . . Portsmouth." Second, the failure to provide Portsmouth's depositors with a preferential opportunity to purchase Portsmouth stock upon the Bank's conversion would deny the "substantial equitable rights" of the depositors, in whom "all rights of ownership are vested."

It is significant that the appellants do not claim that the "windfall" to Amoskeag would result from Amoskeag's acquisition of the Portsmouth stock for less consideration than the Portsmouth depositors would pay if they were to acquire that stock in a stand-alone conversion. That is, the appellants do not claim that Amoskeag's alleged windfall would be any greater than the windfall that would

probably have benefited the subscribing depositors of Portsmouth if Portsmouth's trustees had decided upon a stand-alone conversion.

Nor do the appellants explain how the existing record supports their assumption that they are likely to profit less from owning the Amoskeag stock to which they would have a preferential opportunity to subscribe, than from owning the Portsmouth stock to which they claim a preferential right to subscribe. In fact, there is some opinion evidence in the record that subscription to the Amoskeag stock would promise the greater profit, but we are in no position to assess this.

It is inferable, in any event, that the appellants believe that it would be more advantageous to subscribe to buy the Portsmouth stock directly. Underlying their position is another implicit assumption, that in a mutual savings bank's stand-alone conversion, depositors customarily subscribe for stock at a price that the subsequent market price will soon exceed, and we may assume that a history of stand-alone conversions in New Hampshire would bear this out. When, then, the appellants object that Amoskeag would obtain its windfall "without any corresponding benefit being conferred upon the depositors of . . . Portsmouth," they are in reality complaining that the depositors would not receive a windfall provided by a comparatively safe speculative opportunity to buy low and sell high.

If we assume with the appellants that any original transferee of the Portsmouth stock will probably obtain some windfall, this appeal poses the question whether Portsmouth's depositors have a better legally cognizable claim to that windfall than does Amoskeag, as representing both its existing stockholders and subscribers to the proposed new issue of its own stock. If, indeed, Portsmouth's depositors have no better claim than Amoskeag, nothing in the appellants' arguments indicates that the trustees and the board otherwise lacked justification for adopting and approving the conversion-acquisition plan.

It is in addressing this issue, of the depositors' and Amoskeag's relative entitlements, that the appellants argue that depositors may demand preferential subscription rights to buy the Portsmouth stock in a stand-alone conversion because they already own the surplus that the new shares will represent. In their brief, the appellants assert that Portsmouth's depositors "are the owners of the bank," including its surplus, which Portsmouth's charter "requires [to be distributed to depositors," each of whom owns a "respective share of the bank (sic) surplus net worth." (If the appellants are correct, we might go further and ask why the depositors could not demand more than mere subscription rights. The appellants do not directly raise

this question, however, although the majority opinion does so implicitly.)

As the appellants thus address the issue, the appeal should turn on whether Portsmouth's depositors own its surplus, with the result that the preservation of their ownership justifies their claim as a matter of right to a preferential stock subscription opportunity. Although the majority of the court also pose the issue in terms of the depositors' ownership, both the majority and the appellants foster confusion by doing so. By asking the wrong question, they invite the wrong answer.

It is hornbook law that ownership is in reality a bundle of rights to use and enjoy property, see *Trustees &c. Academy v. Exeter*, 92 N.H. 473, 485, 33 A.2d 665, 673 (1943); *Superior Bath Co. v. McCarroll*, 312 U.S. 176, 180–81 (1941), not all of which will necessarily be enjoyed by an "owner" or enjoyed simultaneously. *See Burrows v. City of Keene*, 121 N.H. 590, 598–99, 432 A.2d 15, 19–20 (1981). A risk of imprecision is always present, therefore, when we phrase an issue with such a compendious term as "ownership." And when significant characteristics of ownership are found to be missing in a given instance, talk of ownership regresses from imprecision to eccentricity. Such is the case here.

The act of making a deposit in a mutual savings bank produces no document or other explicit recognition of a property interest in anything but the deposit. The depositor has, of course, no legal title to the surplus or to the securities in which it may be invested. He did not bargain for any beneficial interest in the surplus or furnish any consideration for it beyond his act of deposit; during the period of his deposit he enjoys no right to transfer it to another, *see Trustees &c. Academy v. Exeter supra*, and any such interest would be subject to uncontrollable dilution resulting from the deposits of others; he will retain no beneficial interest if he withdraws his deposit, and he will receive no return for relinquishing it if he does make a withdrawal. Thus, it is patently clear that the appellants are wrong when they state that "all rights of ownership are vested" in the depositors, and it is equally clear that if the depositors could be said to own the surplus in any sense, that sense would be a highly peculiar and limited one.

To speak of a depositor's ownership in this context therefore invites confusion. It invites another ill effect, as well, for it carries false suggestions about the range of choices that may confront us. On the one hand, to ask whether the depositors own the surplus is to suggest that they may not be entitled to benefit from it, or even be eligible to receive some benefit, unless they are the owners. This

way of looking at the issue suffers from a tendency to obscure the widely differing sources of property interests. It tends to ignore the possibilities that depositors may be able to claim a benefit derived from surplus simply as a matter of contract, or to receive some benefit because statutory or common law gives discretion to trustees to make distributions that are justifiable on grounds of good commercial policy, quite independently of ownership or title. *See, e.g.,* RSA 386-B:1, III (Supp. 1986). On the other hand, thinking in terms as broad as depositors' ownership tends to ignore the possibility that, in managing a mutual savings bank's surplus, the bank's trustees may have obligations to segments of the public as well as to the bank's depositors. *Compare In re City Sav. Bank,* 113 N.H. 378, 381, 309 A.2d 31, 32–33 (1973) *with Barrett v. Bloomfield Savings Institution,* 64 N.J. Eq. (19 Dick.) 425, 434, 54 A. 543, 546 (1903), *aff'd,* 66 N.J. Eq. (21 Dick.) 431, 57 A. 1131 (1904).

Clarity will not be served, therefore, by asking simplistically whether Portsmouth's depositors own the surplus. Instead, we should ask whether the depositors have any interest in the surplus and, if so, whether the plan would recognize and protect it. *Cf.* RSA 386-B:1, III, :8, I (Supp. 1986). The trustees, of course, concede that the depositors have an interest in sharing in a pro rata distribution of the surplus upon the contingency of a solvent liquidation at some future time. Later in this opinion, I will speak of the authority for recognizing this interest, but it is sufficient here to note that the claims of the existing depositors arising from this possible contingency are preserved to them by the liquidation account.

Because these contingent interests are thus recognized and protected, and no other contingent interests are claimed, our question may be narrowed by asking whether Portsmouth's depositors have any further, mature interests in the surplus. By a "mature interest" I mean a right, enforceable against the Bank, to the present enjoyment of the surplus or some advantage derived from its use, such as a right to receive a cash distribution, or to pledge some portion of surplus as collateral security, or the like.

If the answer is that they have no such mature interest, then by the terms of their own argument they will be without any right to protect it by a preferential opportunity to subscribe to purchase Portsmouth's stock, which on conversion will represent the surplus. On like reasoning, if they lack any such mature interest, the trustees can have no fiduciary duty to protect it.

In addressing the question, I will not dwell on the terms of Tru 506.02, which I will assume would authorize what the plan provides. The question before us is whether the depositors' have a mature

property interest that would be infringed by the planned conversion-acquisition, whether or not it would be consistent with the board's regulation. It is essential, then, to address the question directly, by examining the sources of authority relied upon by the appellants.

The appellants have cited three sources for the depositors' asserted present ownership of surplus, and hence for a mature interest in it prior to any liquidation: the decision of the Supreme Court of the United States in *Paulsen v. Commissioner,* 469 U.S. 131 (1985), the terms of Portsmouth's 1823 charter, and the holdings of New Hampshire cases culminating in the decision of *In re City Savings Bank of Berlin supra.* None of these authorities yields an affirmative answer to the question before us, however, and the last one speaks in the negative.

Neither the appellants nor the majority exhibit much vigor in suggesting that *Paulsen* supports the present ownership claim, and for good reason. The opinion in *Paulsen* included a comparative analysis of the debt and equity characteristics of a depositor's respective interests in two banks, for the purpose of determining whether the owner of a deposit transferred in the merger of those banks enjoyed such a continuity of interest as would qualify the transaction for tax free reorganization treatment under 26 U.S.C. §§ 354(a)(1) and 368(a)(1)(A). When the Court looked beyond the deposit to the depositor's broader relationships with the banks, it had occasion to analyze the characteristics of a federally chartered mutual savings and loan association, which was described as being obligated to make semi-annual distributions of "net earnings and any surplus," and as owned by its depositors. *Paulsen, supra* at 134. This description tells us nothing, however, about the legitimate claims of depositors to the benefit of Portsmouth's surplus, because Portsmouth is not a federally chartered savings and loan, and *Paulsen* is not in point. It is worth stating, nevertheless, in light of the majority's broad-brush approach to the concept of ownership, that the Court ultimately concluded that the *Paulsen* depositors' rights, including a limited right to vote and the right to share in a distribution upon the bank's solvent liquidation, were "insubstantial" as ownership characteristics, *Paulsen, supra* at 140, and of "almost no value," *Paulsen, supra* at 141. The Court quoted *Society for Savings v. Bowers,* 349 U.S. 143, 150 (1955), to the effect that the right to a distribution on solvent liquidation depends on such a remote contingency that its value as a property interest "reduces almost to the vanishing point." To the degree, then, that *Paulsen* may carry any persuasive force in the controversy now before us, it recognized a depositor's ownership of the bank assets in only the most theoretical

sense, without any hint of the practical consequences claimed by the appellants before us.

The invocation of Portsmouth's 1823 charter as the source of a depositor's mature interest in the operating mutual savings bank's surplus calls for more extensive examination. The relevant portion of the charter provides that "the net income and profits of all deposits of money received by said corporation shall be paid out and distributed in just proportions, among the several persons by or for whom the said deposits shall have been made . . . ." Laws 1823, 27:2.

The appellants apparently believe that this language speaks for itself in their favor. They devote no analysis to it, but merely quote it in their brief and proceed to describe the conversion-acquisition plan as a violation of the charter's "express language."

The assertion that the charter's "express language" resolves the case, however, simply denies the existence of the central issue raised by the appellants' reliance on the charter language. The charter does not use the word "surplus," and even if surplus is assumed to be covered by "profits," *see In re City Sav. Bank*, 113 N.H. at 383, 309 A.2d at 33, the remaining language of the charter precludes any view that it "expressly" vests depositors with a mature interest in the surplus, that is, with an interest subject to an enforceable demand for its present realization or enjoyment. The provision quoted above describes the distributable "income and profits" as derived from "deposits" and describes the recipients of distributions of "income and profits" as "persons by or for whom the said deposits shall have been made." The language therefore does not expressly confer any interest on a depositor entitling him to the distribution of any surplus of the operating bank except to the extent he can demonstrate that the profits or surplus are attributable to his own deposit. That is, the charter language grants a depositor an interest in the fruits of his deposit; it says nothing directly about any pro rata interest generally in a surplus accumulated over the years from the investment of other depositors' funds.

My brothers in the majority chide me for this emphasis on the details of the charter's language, however, and offer two responses to my close reading. They first try to reduce it to absurdity by arguing that my view would require the Bank "to maintain separate investments for each depositor, else each depositor would receive income derived from other deposits." That is not, however, the implication of a provision that simply obligates the Bank to pay the depositors a return reasonably attributable to their deposits. In any case, the object of my careful reading is merely to demonstrate that the charter contains no express or explicit provision for depositors'

rights in surplus generally, however and whenever that surplus may have been derived. The charter is simply silent about what depositors may demand from assets they have not contributed directly or furnished indirectly in the form of income from their deposits.

This silence is a fact, and the majority opinion itself goes far to explain why the fact is not surprising. The opinion explains that "in the nineteenth century and early twentieth century surplus earnings of mutual savings banks did more than accrue—they were paid out to depositors." There was no general statutory requirement for a savings bank even to accumulate a guaranty fund against losses until 1874. *See* Laws 1874, 71:5; RSA 386:9. And it was only recently that federal statutes and regulations may for a time have accelerated accumulations of surplus by placing limits on savings banks' payouts, as the majority opinion describes in considerable detail. Hence, we can understand why the draftsmen of the 1823 charter did not make any clear or explicit provision for rights in or to surplus with a dimension that they probably did not anticipate.

The majority's second response to my emphasis on the exact charter language concedes my point, however, for the majority proceed to an interpretive exercise. They argue that "[i]f the depositors were not to receive reasonable payments from surplus, then someone else would, which of course contradicts the . . . premise" that "[i]n 1823, mutual savings banks . . . existed by definition solely for the benefit of their depositors." Thus, when the charter speaks of "income and profits" it must be read to include "surplus," because the trustees would otherwise be authorized to pay out surplus to someone other than the depositors.

Three points about this argument are significant. First, its essence is that recognition of depositors' ownership of the assets of the operating Bank would be consistent with the charter's express provisions about the distribution of income and profits. Second, it leads the majority to hold unequivocally that the charter's reference to " 'income and profits' includes 'surplus,' " and it is clear that "surplus" as the majority use the term means the net worth of seventeen million dollars now held by Portsmouth. I will consider the consequences of this holding later on. Third, whatever may be the merits of the majority's interpretive argument, it would carry the greatest persuasive force on the assumption that the interpretive slate were otherwise clean. The slate is not clean, however, and we have to consider the majority's interpretation in light of prior case law. We thus come to the third source that the appellants invoke in support of their claim that a depositor owns the surplus of an operating mutual savings bank.

Here we may all agree on one point, anticipated already, that longstanding case law supports the rule that "upon the winding up of the business of [a mutual savings] bank each depositor is entitled to his share of the assets and property remaining after the payment of the debts," just as if the depositor were a corporate shareholder. *Cogswell v. Bank*, 59 N.H. 43, 44 (1879); *cf.* G.S. 152:17. This view is reflected today in RSA 386-B:1, III (Supp. 1986), which defines the "proprietary interests" of savings bank depositors, for purposes of the mutual holding company act, as

> "the proportionate inchoate interests that such depositors have in the net worth of such bank, such interests maturing and being realized upon the bank's liquidation and after the claims of all creditors (including those of depositors as creditors) have been satisfied."

(It is this inchoate interest contingent upon solvent liquidation that would be preserved by the creation of a liquidation account in accordance with Tru 502.05, as I noted above.)

With the recognition of this contingent interest of the depositors, however, our general agreement ends. The majority rely on *Cogswell* and later cases for indications that mutual savings bank depositors as well as corporate stockholders enjoy equity interests in corporate assets, going beyond contingent rights to share in solvent liquidations. Unlike the majority, I submit that *Cogswell* and the later cases cited in the majority opinion must be read, and largely rejected, in the limiting light of *In re City Savings Bank of Berlin*, 113 N.H. 378, 309 A.2d 31 (1973).

*City Savings* has become all things to all people in the controversy before us, as each side has claimed the authority of the case, or denied its support for the opposing party. While the majority opinion takes the appellants' view of the case's holding, I believe that the appellants misread *City Savings*. Because I also believe that *City Savings* is directly in point and supports the trustees and the board on the facts now before us, I will have to dwell at some length on the case's ostensibly familiar ground.

In *City Savings*, an institutional depositor in a mutual savings bank appealed a superior court decree permitting the consolidation of that bank with a State-chartered trust company, as authorized by RSA chapter 388. RSA 388:1 provides, *inter alia*, that any mutual savings bank incorporated under the laws of the State, and any trust company similarly incorporated, may apply to the superior court for a decree authorizing a "union" or consolidation of the banks and for "the dissolution of such of them as are to be liquidated in the consoli-

dation." The Reserved Case in *City Savings* explains in some detail what appears from a careful reading of the court's opinion, that the plan of merger there at issue provided for the dissolution of the savings bank. *See id.* at 379–80, 309 A.2d at 31; Sup. Ct. docket no. 6605, Reserved Case p. 2. Under the plan, the savings bank would first exchange its assets, including surplus, for stock in the trust company. The savings bank would then be liquidated by a distribution of its sole remaining asset, the trust company stock, pro rata to the savings depositors, under the rule recognized in *Cogswell. Id.*

The appealing depositor in *City Savings* was dissatisfied with the contemplated distribution of trust company stock upon the savings bank's liquidation, and demanded to receive instead the cash value of its claimed ownership share in the surplus, prior to the savings bank's exchange of assets for trust company stock and prior to the savings bank's liquidation. The depositor raised two constitutional arguments: that approval of the proposed transfer to the trust company of savings bank surplus would effect a taking of its property without just compensation, and that approval of the proposed transfer would deny the depositor equal protection of the laws, since a dissenting shareholder of a bank organized in stock form would have been entitled to cash under RSA 388:13, paralleling the provisions of RSA 294:76 (repealed; *see* RSA 293-A:81 (Supp. 1986)).

Each argument rested on the asserted similarity of the respective mature equity interests of depositor and shareholder in corporate assets, a similarity that earlier cases had appeared to recognize. This court, however, flatly rejected the analogy and denied relief in language that is equally fatal to the present appellants' assertion that a depositor "owns" the surplus of an operating mutual savings bank:

> "Having no voice in the management of the affairs of the bank, a depositor today in a mutual savings bank is an 'owner' of the bank and its surplus more in theory than in reality; in most respects his ' "ownership" is only a technical fiction.' Kreider, *Who Owns the Mutuals? Proposals for Reform of Membership Rights in Mutual Insurance and Banking Companies*, 41 U. Cin. L. Rev. 275, 276 (1972). As stated by the bank commissioner in his report to the superior court: 'The depositor in the liquidation of a mutual savings bank receives a share of the surplus [which] is commonly called a "windfall." Receiving the "windfall" is something the depositor neither earned [n]or bargained for.' This is because the depositor in a modern mutual sav-

ings bank is *not* similar to the stockholder of a commercial bank or of any other commercial enterprise. *See Cogswell v. Bank,* [5]9 N.H. 43 (1879)."

*In re City Sav. Bank, supra* at 381, 309 A.2d at 32. (Emphasis in original.)

The opinion closed by quoting from the City Savings Bank's charter, which provided that all "profits arising from said business" should be divided equitably among depositors, when and as the trustees should determine. *City Savings, supra* at 383, 309 A.2d at 33. (I note that this provision, unlike the charter language now before us, did not restrictively describe the recipients of obligatory distributions as persons who made the deposits that produced the profits, or on whose behalf such deposits were made.) After observing that the trustees planned to distribute profits in the form of the trust company stock that it would receive in exchange for its existing surplus and other assets, the court concluded that the distribution would be consistent with the controlling language of the charter.

Because *City Savings* is not the easiest opinion to read, its holding cannot be stressed too carefully. The court described the interest of a mutual savings bank's depositor in the bank's assets as a technical fiction in most respects. It recognized no enforceable claim or ownership interest of a mutual savings bank's depositor in such a bank's surplus, except the contingent right to a distribution upon liquidation, and it approvingly quoted language describing such a liquidation distribution as a "windfall." After holding expressly that the mutual savings depositors under the *City Savings* charter did not have equity interests comparable to shareholders' interests in corporate assets, the court concluded that the guarantee of equal protection was no basis for such a depositor to claim a cash distribution of a share of assets, even in circumstances that would have entitled a corporate shareholder to just such a distribution.

Two observations may sharpen the focus of the *City Savings* rationale. First, since a *City Savings* depositor lacked a sufficient mature interest in surplus to ground a claim to a cash distribution prior to a pre-liquidation merger, the depositor presumably would have lacked entitlement to a cash distribution in the absence of any merger and liquidation plan. (This is not to say, of course, that the bank's trustees could not have made such a distribution; the case was dealing solely with a depositor's entitlement to compel one.) Second, the court recognized only one exception to the general rule that a depositor's proprietory interest is a mere technical fiction, and that exception was the contingent interest derived from the right to a liquidation distribution. Because an ownership interest

that is merely a technical fiction is no interest at all, the most reasonable reading of *City Savings* is that the depositor has no mature, as distinct from contingent, interest in the bank's surplus.

While the application of this analysis to the case now before us depends on the comparability of the language of the bank charters under examination, when we do compare them, the holding in *City Savings* cannot be distinguished away. As I noted above, the charter in *City Savings* was less restrictive than the Portsmouth charter before us now, in its provision for distributions of "profits" to depositors. If we are to act consistently with *City Savings*, then, we cannot interpret the language of the Portsmouth charter to vest any greater interest in the Portsmouth depositors than the depositors in *City Savings* were held to have. Since the latter had no mature interest in the surplus, as distinct from the right to a liquidation "windfall," the Portsmouth depositors can claim nothing more, unless *City Savings* is to be overruled.

The majority attempt to cast *City Savings* in a different light, however, and they point to one statement in the opinion that appears at first blush to support their own view. After disposing of the constitutional issues, the court in *City Savings* considered a further argument much like the one before us, that the plan was inequitable to depositors. The court responded by quoting from *Manchester Savings Bank v. N.H. Association of Savings Banks*, 110 N.H. 341, 347, 266 A.2d 838, 842 (1970), where it had observed that the depositors' interest in the "surplus of the savings bank is preserved by converting it to an interest in the equity of the trust company which will own the assets" of the preexisting savings bank. This quotation is apparently what the majority have in mind when they state that the *City Savings* opinion "assumed" that the depositors "owned the bank's surplus."

A careful examination of *City Savings* and the record in *Manchester Savings*, however, reveals that the court made no such assumption in either case. Like *City Savings*, *Manchester Savings* was an appeal challenging the legality of a plan of merger under RSA chapter 388, under which a mutual savings bank would be liquidated after transferring its surplus to a trust company. (For details of the plan, *see Manchester Savings Bank v. N.H. Association of Savings Banks*, Sup. Ct. docket no. 6049, Reserved Case pp. 3–5, 18.) Prior to its liquidation the savings bank would make a series of transfers, in return for which it would ultimately be left with certain voting trust certificates as its sole assets. The plan called for the distribution of these certificates, *see Manchester Savings*, *supra* at 343, 266 A.2d at 840, or scrip representing fractional interests in

them, *Manchester Savings, supra* at 347, 266 A.2d at 843, to the depositors upon the bank's liquidation. The only interest of a depositor in surplus that was thereby "preserved" was thus an interest contingent upon the bank's liquidation. No issue was raised about a depositor's right to receive such a liquidation distribution, and neither the opinion nor the record indicates that a depositor might have any right to a distribution from surplus except upon liquidation.

The same must be said of *City Savings*. The attempt of the majority to claim some support from the case rests on a misunderstanding, focused in the majority opinion's statement that *City Savings* "indicates that the depositors did have a right to distribution of the surplus, but held that this right was adequately protected by the ratable stock transfer." The majority overlook the fact that the depositors had a "right to distribution of the surplus" only because the merger in *City Savings* called for the liquidation of the savings bank, an event that would not occur under the conversion-acquisition plan for Portsmouth. *See* Tru 505.07. They likewise fail to see that *City Savings* held that the proposed "stock transfer" would protect a depositor's right, solely because the trust company stock to be transferred would be the savings bank's sole asset at the time of liquidation.

In summary, then, neither *City Savings* nor *Manchester Savings* recognized any claim of a depositor to surplus except upon the savings bank's liquidation, and the recognition of the right to a liquidation distribution is no authority for the majority's holding that a depositor owns the surplus before liquidation. Conversely, there is no basis to distinguish away the applicability of the *City Savings* holding, that prior to liquidation a mutual savings depositor has no property interest in the bank's surplus rising above a technical fiction, which is to say no mature interest at all. As a consequence, the majority cannot extricate themselves from the result of overruling *City Savings* by what they do today.

In overruling that prior law, they err, however, for three independent but complementary reasons. There is, first, the claim of *stare decisis* itself, "a principle of policy," *Monroe v. Pape*, 365 U.S. 167, 222 (1961) (Frankfurter, J., dissenting), *overruled on other grounds, Monnell v. New York City Department of Social Services*, 436 U.S. 658, 695 (1978), which "is essential if case-by-case judicial decision-making is to be reconciled with the principle of the rule of law, for when governing legal standards are open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results." *Thornburgh v. American*

*College of Obstetricians,* 106 S. Ct. 2169, 2192 (1986) (White, J., dissenting). Although it is a familiar observation that the strength of precedent's claim will vary with its context, *see, e.g., Monnell v. New York City Department of Social Services, supra* at 695; and *compare Monroe v. Pape, supra* at 192 (Harlan, J., concurring in part) *with Oregon v. Mitchell,* 400 U.S. 112, 217–18 (1970) (Harlan, J., dissenting in part), the claim is certainly powerful in a case like the one before us, which arises in "an area of commercial law in which, presumably, individuals may have arranged their affairs in reliance upon the expected stability of decision." *Monroe v. Pape, supra* at 221–22 (Frankfurter, J., dissenting). Only the weightiest of reasons could justify a refusal to honor the expectations of the institutions and the board, whose officers and members should be entitled to rely on the 1973 decision of this court in *City Savings.*

Second, even if we did reexamine *City Savings,* there would be enough reason to adhere to it. The majority in effect criticize *City Savings* for resting on a facile view that property rights under a charter can be extinguished by the vicissitudes of commercial evolution, but that is a harsh view of the case. The charter quoted in *City Savings,* like Portsmouth's charter, did not affirmatively address the formation or disposition of a surplus that the charter's draftsmen most probably never even thought possible. The court admittedly did not attempt to derive a principle for decision from such intentions as the charter did reveal, but having assumed that the charter left a depositor's pre-liquidation interest in surplus an open question, the court reasonably emphasized that a depositor who had not bargained for any equity in surplus, whose deposit had not earned the equivalent of any pro rata surplus interest, and who had assumed no risk of losing his deposit, had no equitable claim to anything more than the deposit and the fruits of its investment.

The court in *City Savings* was, if anything, laconic in explaining why a depositor's relation to surplus failed to measure up even to a loose conception of beneficial ownership. After recalling the reasons I marshalled for rejecting the present appellants' statement that all rights of surplus ownership are vested in the depositors, it is no surprise that the court in *City Savings* described even a depositor's conceded right to a liquidation distribution as a "windfall." In these unpromising circumstances, to have inferred a mature pre-liquidation property interest would have been weaving with whole cloth, and Chief Justice Kenison's reasoning in *City Savings* does not cry out to be overruled.

*City Savings* has, moreover, a further claim to support, which has yet to be developed in any detail, but which should not be foreclosed.

In its holding that the depositors have no mature interest in an operating mutual savings bank's surplus, *City Savings* invited the question of what obligations the trustees of such a bank do have to accumulate, invest and dispose of surplus during the bank's operating life. I will not presume to answer that complex question here, but it is enough to realize that under *City Savings* the door was open to consider the obligation of such a bank's trustees to the broader community that could be helped or hurt by what a bank did with its surplus.

To give just one example of what I have in mind, under *City Savings* both the trustees and the board had the clear opportunity to consider a policy formerly espoused by the Federal Home Loan Bank Board in the interest of institutional financial stability.

> "The board has determined that a method of conversion which provides a so-called 'windfall' distribution to the account holders of a converting mutual insured institution would create strong incentives for significant shifts of savings funds among insured institutions and other financial institutions and that such shifts of savings funds would unacceptably threaten the financial stability of such institutions. The Board has also determined that a method of conversion which provides a so-called 'windfall' distribution would tend to force individual mutual insured institutions to convert to the stock form irrespective of whether such institutions or the communities they serve would be benefitted thereby. The Board therefore finds that no method of conversion can be considered equitable unless such 'windfall' distribution is virtually eliminated."

44 Fed. Reg. 18,883 (March 29, 1979); withdrawn 48 Fed. Reg. 15,594 (April 12, 1985).

It is significant that the majority decision will probably mandate such windfalls and force conversions, but it is more significant that labelling the depositors as owners of surplus will tend to discourage attention to the undoubted public interest in the way a mutual savings bank's surplus is treated. Any consideration of public policy in determining the appropriate use of surplus, be it by a mutual savings bank's trustees, by the board, by the legislature or by this court, will be exposed to the objection that "ownership" must not be infringed. While the objection would be proper if the ascription of ownership were justifiable, such is not the case. This regrettable consequence of repudiating *City Savings* reflects the assumption with which the majority began, that one person or class must "own"

the surplus, as distinguished from the assumption that the beneficial interest in the surplus may be subject to a congeries of legitimate claims over time. In any case, the majority opinion's impediment to considerations of the broader public interest should militate against overruling *City Savings* without a compelling justification, which is entirely lacking here.

The third reason to adhere to *City Savings* is reflexive, comprising the uncertainties that will follow from overruling it. Although legal certainty may always be relative, it is noteworthy that the majority expressly disclaim to predict the consequences of what they hold, beyond vacating the board's approval of the proposed conversion-acquisition: "We . . . do not specify what course the Bank's trustees may, or even must, take in the event of a stand-alone conversion . . . ." Nor, of course, do the majority specify what the future may hold for Portsmouth's surplus, or for the surpluses of other mutual savings banks, in the absence of the banks' conversions to stock form.

There is in this reticence a promise of more litigation to come. The majority's quoted disclaimer is itself pregnant with the suggestion that the traditional practice of granting a depositor the preferential opportunity to purchase a mutual savings bank's stock upon its conversion may be an insufficient recognition of the ownership status that today's decision appears to create. It is therefore now an open question whether Portsmouth's charter can be read to empower the trustees to require a depositor to contribute new capital through stock subscription, in order to preserve the depositor's vested ownership of the surplus of the operating bank.

An equally inviting subject of litigation is the unqualified simplicity of the majority conclusion that Portsmouth's charter includes the entire surplus in the sweep of "income and profits." As I noted before, the majority do not merely hold that "income and profits" include the current return on invested surplus or some portion of surplus representing recently undistributed income; they hold that "income and profits" include the entire accumulated surplus of seventeen million dollars. Whatever this may ultimately be taken to mean in practical terms, it means that a depositor's demand for distribution need not be limited to a reasonable portion of current net income. *Cf.* RSA 386-B:8, I (Supp. 1986). And despite the majority's suggestion that their opinion may apply only to Portsmouth and two other pre-1842 mutual savings banks, they also appear to hold that RSA 386:10, I, leads to the same result for all mutual savings banks, now that the repeal of federal regulation has rendered the State statute permitting dividends "fully enforceable." I therefore assume

that, after the release of today's opinion, mutual depositors will have a colorable basis to demand distributions from surpluses accumulated over long periods of time, and to sue for them in the superior court to the extent that the trustees of the State's mutual savings banks do not comply. I will not try to predict the results of such suits, which I cannot do; it is enough to note the likelihood that demands and litigation will follow in the wake of the majority's holding, and that they will not necessarily be confined to the three banks chartered before 1842. This should be cause for some foreboding, despite the majority's express assumption that the judiciary will be up to the task of deciding how much of a bank's net worth it would be reasonable to distribute on demand. I do not share such optimism about the judiciary's commercial wisdom.

A final uncertainty has to be faced. If a future case does present the opportunity to test the extent and the consequences of the "ownership" that the majority have recognized today, that case may also present the court with the further issue of whether to follow today's majority at all. The majority consists of two members of this court together with Justice Nadeau of the Superior Court sitting by assignment under RSA 490:3, II, in place of Justice Thayer, who did not sit. Although this court has not previously considered the precedential force of an opinion that would lack majority status without the concurrence of an assigned justice, I am forced to raise the issue here, despite my respect for Justice Nadeau and for the strength of his convictions in this case. Again, I will not presume to say here how this issue should be resolved, but we must recognize that the aftermath of this case may force us to resolve it. The mere fact that the majority holding may be subject to reexamination on this basis reveals an institutional weakness inherent in the authority to fill vacancies by assignment under RSA 490:3, II, and should persuade the majority to follow *City Savings* until and unless that case is overruled by a majority of sitting members of this court.

As it is, the majority have not faced the facts or the effects of overruling our prior law. They fail to establish persuasively that Portsmouth's depositors are vested with a mature interest in the Bank's surplus, for so long as the Bank continues in operation, and they likewise fail to demonstrate that the depositors are entitled to anything more than the plan provided for them. Because the majority have furnished no basis to reverse the board for illegality or unreasonableness under RSA 541:13, I respectfully dissent.